(No. 13804.—Reversed and remanded.)

THE MT. CARMEL PUBLIC UTILITY AND SERVICE COM-
PANY, Appellant, *vs.* THE PUBLIC UTILITIES COMMIS-
SION, Appellee.

*Opinion filed April 21, 1921.*

I. PUBLIC UTILITIES—*State cannot compel public utility corpo-
ration to serve the public without compensation.* The State has no
power to compel a public utility corporation to serve the public
without reasonable compensation, as legislation, in whatever form,
by which the property of one is applied to the use of another or
of the public without compensation is forbidden by section 2 of
the bill of rights of the. State constitution and by the fourteenth
amendment of the Federal constitution, but a corporation may be
required to fulfill an obligation imposed by its charter even though
it may be done at a loss.

2. SAME—*a public utility cannot be compelled to carry on any
branch of its business at a loss.* Where a public utility corporation
is engaged in furnishing to the public, through various departments
of its business, different kinds of service, it cannot be compelled
to carry on a .branch of its business which furnishes one kind of
such service at a loss even though at the same time its whole busi-
ness may be conducted at a profit.

3. SAME—*when order to compel a heating company to repair
plant and· furnish heat to customers is unreasonable.* Where a heat-
ing and lighting company which is authorized but is not required
by its charter to furnish heat to customers files a petition with the
Public Utilities Commission to abandon its heating service and
makes a *prima facie* showing that to continue the service will
require an expenditure equal to the value of the plant and that
the plant will not then give any return on the investment, an order
.made without investigation and without any finding of facts on
which it is based, practically requiring the construction of a new
plant and compelling the company to continue its service indefi-
nitely, is unreasonable and amounts to an appropriation of prop-
erty to public use without compensation.

APPEAL from the Circuit Court of Sangamon county;
the Hon. NORMAN Ļ. JONȨS, Judge, presiding.

PHILIP BARTON WARRȨN, for appellant.

EDWARD J. BRUNDAGE, Attorney General, (MORTON T. CULVER, ALBERT D. RODENBERG, and WILLIAM E. TRAUTMANN, of counsel,) for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

This is an appeal from an order of the circuit court of Sangamon county affirming an order of the Public Utilities Commission entered October 19, 1920, which dismissed the petition of the Mt. Carmel Public Utility and Service Company for permission to abandon its heating service in the city of Mt. Carmel and required it to furnish heating service instanter and during the season of 1920-21 and thereafter until relieved by the court, and at once to make such repairs as might be necessary to carry it through the heating season and to complete them within thirty days.

The Mt. Carmel Public Utility and Service Company, the appellant, filed its application with the Public Utilities Commission on June 21, 1920, for permission to abandon its heating service, stating that the property of the heating department had depreciated to such an extent that to insure its operation would require a complete rehabilitation, and that owing to the shortage of labor and the high price of materials the company felt obliged to give up this department, and with its petition to abandon had surrendered its franchise to the local authorities. The city of Mt. Carmel, by its mayor, on July 19 filed objections to the abandonment of the heating service, and on July 20 a hearing was begun before an examiner, which was not then completed but was continued until September 7, when further evidence was heard and the case was submitted. On October 4 the mayor of Mt. Carmel filed a complaint with the commission showing that the company was neglecting and refusing to furnish heat for the city hall, which was required of the company by the franchise, and that it was neglecting and refusing to furnish heat to any of its pa-

trons, and praying that it be directed and instructed to
furnish heat to its patrons.    The company having been
notified of this complaint it was heard on October 15, and
on October 19 the order in controversy was made, stating
that "the commission has had no opportunity to investigate
the matter under consideration; and aside from this, there
is insufficient evidence of record which would justify the
commission to pass definitely on the company's application
at this time."    The commission made a finding "that the
Mt. Carmel Public Utility and Service Company should re-
sume the rendering of heat service in the city of Mt. Carmel
instanter; that such necessary repairs of its heating sys-
tem as may be necessary to render heat service during the
1920-21 heat season should be made immediately, and that
the petition to abandon the heat service should be dismissed."

The contention of the appellant is that under the cir-
cumstances shown in the record the order is unreasonable,
oppressive and arbitrary and is repugnant to the provi-
sions of the State and Federal constitutions, which assure
the equal protection of the law to all and prohibit the de-
privation of property without due process of law.

It appears from the record that the Mt. Carmel Pub-
lic Utility and Service Company was organized in 1915,
or earlier, for the purpose of acquiring the property,
rights, privileges and franchises which had belonged to
the Mt. Carmel Gas and Electric Company and had been
sold on July 19, 1911, under a decree for the foreclosure
of a mortgage rendered by the United States circuit court
for the eastern district of Illinois to Fred Hertenstein,
representing the holders of the bonds secured by the mort-
gage foreclosed.    After a hearing upon his petition to issue
$400,000 of stock and an investigation and appraisal of the
property by its engineers, the Public Utilities Commission
authorized the issue of $300,000 of stock and the execu-
tion of a mortgage to secure a loan of $50,000.    The prop-
erty and rights acquired by Hertenstein were conveyed to

297—20

the new corporation, and it has since been engaged in the operation of a public utility in Mt. Carmel, furnishing gas, electricity, water and heat. The heat is furnished under the authority of an ordinance passed in 1906 giving that right for fifty years to the New Electric Company, which assigned its rights to the Mt. Carmel Gas and Electric Company, which assigned them to the appellant. The company applied in 1917 for an increase of heating rates, to which objection was filed, and an order was made granting a part of the increase asked. No dividend has ever been paid to the stockholders. The $50,000 mortgage has been paid, improvements aggregating $42,000 have been installed, and the four departments of the appellant's business, in the aggregate, have been operated at a profit. In 1919, according to the figures testified to on behalf of the appellant, which are not disputed, the net income from the electric and water departments, making no allowance for depreciation, was $27,070.96, while the gas department lost $1178.15 and the heating department $1536.23, so that the company's net income from all branches of its plant was $24,356.58. After deducting $10,000 for depreciation on all of the appellant's property the net earnings were $14,-356.58, which is 4.78 per cent of the $300,000 capital stock of the appellant. For the first six months of 1920 the net income of the electric and water departments, disregarding depreciation, was $7911.21, there was a loss in the gas department of $2375.17 and in the heat department of $1313.73, so that the net earnings, disregarding interest and depreciation, were $4222.31.

The heating system is a hot water type, consisting of about 15,000 feet of flow and return pipes and with condensers and pumps. It was constructed by the predecessors of the appellant and is about fifteen years old, and was valued, as estimated by the Public Utilities Commission in 1918, at $75,000. The condensers and pumps are in bad order, having lost about seventy-five per cent of their use-

fulness. Five blocks of the pipe are installed three feet under brick pavements and encased in wood and shavings. P. Barnhard, the president of the company, testifying at the hearing on July 20, 1920, said that the system had depreciated to such an extent that it would be folly to attempt to operate it another year. The shavings in the wood insulation had entirely gone. In strips a big cavity existed from end to end and since last July the chlorinator had attacked the mains. The company had numerous interruptions but attempted to keep the system running and had tried to get it running the latter part of September, 1919, but it was November 1 before it had all the customers in operation. Often the plant was down, and the service was so unsatisfactory that it had to rebate every customer from ten to twenty-five per cent. Fifty-five was the maximum number of installations, and at the time of testifying twenty had procured other means of heating. To supply these customers it would be necessary to re-build the plant and mains, and that would cost $100,000. The total income from the fifty-five customers was $5000 a year, from which must be deducted $1200 representing rebates for unsatisfactory service. The operating expenses for the heating season 1918-19 were $7754.13. These expenses do not include return on the money invested, depreciation, taxes or insurance. The amount of $100,000 (the cost to put the plant in condition for operation) was arrived at by considering the present price of pipe and labor. It would be impossible to get the material to install it before it was time to operate again. The heating mains are in the streets. The boilers are in the same plant as the electric lighting property. It is operated as a department. In November, 1919, the patrons of the heating plant were notified that the company would be lucky if it got through the winter, and the heat which was furnished was so unsatisfactory that although the last heat was furnished in April, there remained due from customers in July the sum of $1000, which was contested be-

cause of the poor service. At the close of the heating season there appear to have remained thirty-five patrons. On August 22 the company published in the newspaper a notice addressed to its patrons of its application for permission to discontinue the heating service and of the hearing, concluding: "We do not know what the outcome will be, but deem it our duty to inform our patrons of the situation so that they may make all necessary provisions for the coming winter." At the subsequent hearing on October 15 Barnhard testified: "Our former patrons have continued to put in other forms of heating, until, as far as I know, less than a dozen are not prepared for the winter requirements. * * * It is just as impossible to give them heat from our system as it would be to give the child the moon. The plant would have to be rehabilitated completely, and we haven't the time nor the means to do it." Hadley at the hearing in July testified that it would cost the objectors from $45,000 to $50,000 to install their own heating plants. Jacob Seitz at the same hearing testified to the same estimate, and that it would not cost the appellant more than $25,000 to repair its plant; that the whole plant was not destroyed and most of it was pretty good. The estimate of $25,000 is not supported by details and Seitz was not shown to have any knowledge which would qualify him to make an estimate. H. E. Pieper, commissioner of streets and public improvements, testified that "it looks to me like the plant could be repaired and used another year. Some of the pipes apparently look as if they were in good condition, but pipes will look like that to any man." He also testified that he had a good opportunity to note the method of carrying on the heating plant and could not say that they had made any hard effort to repair the plant. He, too, is not shown to have been qualified by any experience.

The State has no power to compel a corporation engaged in operating a public utility to serve the public without a reasonable compensation. The question has arisen in

relation to the power of legislatures over rates to be charged by railroads, and it has been held that the power is limited and not absolute; that it is a power to regulate and not to destroy or confiscate. Legislation, in whatever form, by which the property of one is applied to the use of another or of the public, without compensation, is forbidden as well by section 2 of the bill of rights in our State constitution as by the fourteenth amendment of the Federal constitution. The courts of the United States have frequently applied these constitutional prohibitions to legislation establishing railroad tariffs, and have held that it is a judicial question whether the acts in question denied to the owners of property invested in transportation companies the equal protection of the law which is guaranteed to all, and that they did so if the rates were so low as to prevent the railroads from earning any compensation for the use of their property after keeping it in repair and paying the expenses of operation. (*Reagan* v. *Farmers' Loan and Trust Co.* 154 U. S. 362; *St. Louis and San Francisco Railway Co.* v. *Gill,* 156 id. 649; *Covington and Lexington Township Turnpike Road Co.* v. *Sandford,* 164 id. 578.) The principle is equally applicable to any legislative act imposing an obligation upon a corporation engaged in a business impressed with a public interest. If the corporation is required by any act or proceeding to devote to the public the use of its property without compensation or without any reasonable compensation it has been deprived of its property and of the equal protection of the law. Where a public utility corporation is engaged in furnishing to the public, through various departments of its business, different kinds of service, it cannot be compelled to carry on a branch of its business which furnishes one kind of such service at a loss even though at the same time its whole business may be conducted at a profit. (*Brooks-Scanlon Co.* v. *Railroad Com.* 251 U. S. 396; *Northern Pacific Railroad Co.* v. *North Dakota,* 236 id. 585; *Norfolk and*

*Western Railroad Co.* v. *West Virginia,* 236 id. 605.)    A corporation may be required to fulfill an obligation imposed by its charter even though it may be done at a loss, but the appellant, though authorized by its charter to do so, was not bound to furnish heat to the public.    Having engaged in that service it became subject to the supervision of the Public Utilities Commission, as provided in the Public Utilities act.    The act provides for a general supervision of all public utilities by the commission and requires every public utility to obey and comply with every requirement of every order made by the commission.    Section 50 of the Public Utilities act provides that "whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that additions, extensions, repairs or improvements to, or changes in, the existing plant, equipment, apparatus, facilities or other physical property of any public utility or of any two or more public utilities ought reasonably to be made, or that a new structure or structures should be erected, to promote the security or convenience of its employees or the public, or in any other way to secure adequate service or facilities, the commission shall make and serve an order directing that such additions, extensions, repairs, improvements or changes be made or such structure or structures be erected in the manner and within the time specified in said order."    The commission is authorized to hold investigations, inquiries and hearings upon complaints made on its own motion or by others, and at the conclusion of any hearing is required to make and render findings concerning the subject matter and facts inquired into and enter its order based thereon.    No finding of facts was made in this case but the commission expressly states in its order that it has had no opportunity to investigate the matter under consideration; and aside from this, there is insufficient evidence of record which would justify the commission to pass definitely on the company's appli-

cation at this time.   The evidence taken indicated that the heating plant was practically worthless; that to enable it to render satisfactory service during the season would require substantially its entire re-construction and would require an expenditure of $100,000,—an amount equal to the value of the plant,—and that the plant would not then pay for its operation and any return on the investment.   This was the condition as shown *prima facie* by the evidence, and such a condition would justify the petition of the company to abandon the service.   The order to the company to furnish heat service to all its customers instanter and continue it during the 1920-21 heating season, and thereafter until relieved by the commission, was, in effect, a final denial of the company's petition to discontinue the service, admittedly without investigation and upon insufficient evidence.   The order was not based upon any finding of facts.   If the commission required more time for investigation or more evidence to act upon, an order requiring the company to operate its heating plant temporarily while the matter was pending might have been made, but an order without investigation,—without any finding of facts on which it was based,—requiring practically the construction, at great expense, of a new plant which could not be expected to earn a reasonable return on the investment, was not reasonable but amounted to requiring the appellant to devote its property to the public use without regard to compensation.

The judgment of the circuit court of Sangamon county will be reversed and the cause will be remanded, with directions to that court to set aside the order and remand the cause to the Public Utilities Commission for a further hearing.                    *Reversed and remanded.*