LaCRESCENT CONSTANT CARE CENTER, INC. v. STATE AND OTHERS.

222 N. W. 2d 87.

September 20, 1974—No. 44379.

*Broeker, Bachman & Zerby, R. Walter Bachman, Jr.,* and *Steven R. Hedges,* for appellant.

*Warren Spannaus,* Attorney General, *Jonathan H. Morgan,* Solicitor General, *Peter W. Sipkins,* Assistant Solicitor General, and *Thomas H. Jensen,* Special Assistant Attorney General, for respondents State, Department of Public Welfare, and commissioner of public welfare.

*Crawford, Anderson & O'Connor,* for respondents Houston County Welfare Department, its director, and chairman of its board.

Heard before Sheran, C. J., and Kelly, Todd, Yetka, and Scott, JJ., and considered and decided by the court en banc.

TODD, JUSTICE.

Plaintiff, LaCrescent Constant Care, Inc., appeals from an order for judgment[1] in favor of defendants in an action for declaratory and other relief arising out of an alleged breach of contract for the provision of nursing home services to public assistance beneficiaries under Subchapter XIX[2] of the Social Security Act. We affirm.

---

[1] Discretionary review granted October 2, 1973.

[2] 42 USCA, § 1396, et seq.

Plaintiff is a Minnesota corporation engaged primarily in the operation of a nursing home in LaCrescent, Minnesota. Luther H. Rodvik and his wife are coadministrators of the nursing home. The nursing home is a 77-bed facility which was opened and first certified in January 1969. At the time of trial, its staff included 10 licensed nurses and 35 nurses' aides and orderlies. Approximately 40 percent of its patients have been and are public assistance recipients.

Public assistance is provided under Subchapter XIX of the Social Security Act, commonly known as "Medicaid." Medicaid provides to qualifying individuals a variety of medical care services, the costs of which are borne by the Federal, state, and county governments.[3] The assistance is in the form of direct payment to the vendors of medical services at rates established in compliance with the "State Plan." The "State Plan" is a document which must be submitted to the Secretary of Health, Education, and Welfare that serves as a statement of intent of the state as to which Medicaid services it will provide and as a general handbook of administrative procedures.

Defendants in the action include the state, the Department of Public Welfare (DPW), which administers the Medicaid program, Ove Wangensteen, either the assistant commissioner or acting commissioner of DPW and general supervisor of the Medicaid program at all times relevant to this action, the Houston County Welfare Department, W. J. Freeman, social services director of the Houston County Department of Social Services, and Hugh Fay, chairman of the Houston County Welfare Department.

There are three categories of nursing homes of concern here. The skilled nursing homes provide professional nursing care on a 24-hour-per-day basis. An intermediate care facility (ICF) provides professional nursing care on a minimum 8-hour-per-

_____

[3] The Federal government pays approximately 57 percent of the cost of the program, while the county and state pay the balance.

day basis. A third group (split facility) provides both skilled and ICF services. Of the 450 nursing homes in Minnesota, approximately half are certified as skilled and half as ICF.

In addition to the differences in nursing staff patterns, there are several other distinguishing characteristics between skilled and ICF within the Medicaid program. Acquiring skilled certification is somewhat more difficult than ICF certification. Although the average skilled facility would receive a higher rate per assistance patient, rate changes for the skilled facilities and split facilities have always required prior approval by the DPW. Prior to January 1, 1972, rates for ICF homes could be negotiated directly with the county welfare board without state approval. H. R. 10,604, 92nd Cong. 1st Sess. (1971), brought ICF homes under Subchapter XIX requiring state approval for rate changes as of January 1, 1972.

The procedure for analyzing and processing requested increases for nursing homes (skilled and split before January 1, 1972) was essentially as follows: The nursing home sent its request to the county welfare board along with a cost statement in support thereof. The county board analyzed the requests and either approved or disapproved. Approvals were forwarded with the cost statement to DPW. The DPW cost analysis staff analyzed the recommendation and in turn sent its recommendation to the director of public assistance staff of DPW for final approval. He would return the approved maximum rate to the county board. This rate was binding on the counties. Guidelines were published for the cost analysis at the DPW level, but these guidelines were not promulgated rules.

All vendors of medical services under the State Plan are required to sign "provider agreements" in which the vendor agrees to keep such records as are necessary to fully disclose the extent of the services provided to individuals receiving assistance and to furnish the state agency with such information as requested. Such agreements are prerequisites to the payment of Federal

funds under the program.[4] The agreements cover a one-year period. Plaintiff signed provider agreements on January 8, 1971, April 20, 1972, and July 1, 1972.

Plaintiff's nursing home was originally certified as 100 percent skilled and was compensated at a rate of $315 per patient per month. On January 9, 1970, it was certified at 100 percent ICF-I.[5] After public hearings held by the Department of Health to distinguish skilled from ICF-I, plaintiff sought certification change which was granted June 5, 1970, and brought plaintiff to its current rating of 50 skilled and 27 ICF-I beds. In December 1969, plaintiff sought a rate increase which was granted in March 1970 at a rate of $330 per patient per month. Although granted at a time that plaintiff was certified 100 percent ICF-I, the recommendation was based on the December 1969 certification of 100 percent skilled.

Although the level of certification was an important consideration in evaluating rate increase requests, other criteria were considered. A primary criteria for a facility that upgraded its certification, as did plaintiff between January and June 1970, was the change, if any, in the level of care. It was shown in plaintiff's cost statements of December 1969 and June 1971 that the level of nursing care measured by the ratio of hours of nursing coverage to actual patient days decreased during that period.

The state's portion of the Medicaid budget is appropriated annually by the legislature as a single lump sum. The state Medicaid appropriation for the fiscal year ending June 30, 1971, was approximately $26,840,000.[6] The appropriation for the fiscal year ending June 30, 1972, was $22,600,000, a cut of over $4,000,-000.[7] Faced with an approximately 12 percent funding cut and insufficient funds to meet the projected costs of all vendors

---

[4] 42 USCA, § 1396a(27).

[5] ICF-I denotes an intermediate care facility giving relatively greater professional care than an ICF-II facility.

[6] L. 1969, c. 1136, § 2, subd. 9.

[7] L. 1971, c. 961, § 2, subd. 10.

under the plan, DPW imposed a freeze on the rates currently paid to all medical vendors with the exception of in-patient hospital care. The latter was excepted on the recommendation of a Federal staff member that a freeze on that service would violate either the rules or regulations under Subchapter XIX. No similar notification was received as to other services under the Medicaid program. The effective date of the freeze was May 25, 1971. No memorandum or official notice of the freeze was communicated until a policy bulletin was sent to the county welfare boards on January 21, 1972. The intent behind the freeze was to fix all maximum payment schedules at their current levels and that rates to individual vendors not be raised even if below the maximum. The freeze was subsequently lifted effective November 1, 1972.[8]

The standard for establishing payment rates for skilled and split nursing homes is "reasonable cost." This is defined in the State Plan as follows:

*"Reasonable cost*—is a charge for service which based upon full disclosure of income and operating expense reflects costs incurred by a prudent competent administrator or businessman to produce a general level of care acceptable to licensing authority and professional users of the service based on the need of the patient."

During the freeze, the DPW intended to fix payment at the current rate for each individual nursing home. This plan was implemented by not forwarding any recommendations for increases from the cost analysis section to the director of public assistance. The DPW recognized some exceptions to the general freeze although no rules pertaining to such exceptions were promulgated. An exception was granted to those nursing homes

---

[8] Although there were no increases in the maximum schedules from May 25, 1971, to November 1, 1972, the freeze was not entirely successful, as there was a 3.4 million dollar deficit for the fiscal year ending June 30, 1972.

beginning operations during the freeze because they had no experience as to actual costs. These homes were assigned an estimated rate which was adjusted to reflect actual costs after some period of operation. A second exception was recognized for facilities that upgraded their certification and level of professional care. Another exception was the Oak Terrace Nursing Home, a state-owned facility for which an annual per diem rate based on actual expenditures was required by statute.

Plaintiff requested a rate increase by letter to the Houston County Welfare Board on April 5, 1971. Because of the pending freeze the request was denied by the county. At a subsequent meeting on June 13, 1971, the county board requested a statement of costs. This statement was submitted on June 16 and forwarded to DPW by June 22. After an inquiry by plaintiff, the county board informed Mr. Rodvik that DPW had made no recommendations for rate increases for 2½ months because of pending legislation. Mr. Rodvik renewed plaintiff's request at the September 20 board meeting. The board approved an increase to $352.50 per patient per month for ICF-I, effective upon the lifting of the freeze.

On October 8, 1971, plaintiff sent to the Houston County Welfare Board a notice purporting to terminate as to skilled care recipients the provider agreement of January 8, 1971, effective November 14, 1971. The notice stated that reason for the termination was the failure of DPW to abide by the State Plan in paying for the costs of care. The notice further stated that plaintiff's costs for skilled nursing patients was $13.75 per day and that failure to remove Subchapter XIX recipients by the effective date would amount to acceptance of that rate by the county board and DPW. It also stated the following:

"You are further notified that all Title [Subchapter] XIX recipients in the LaCrescent Nursing Center have been given copies of both the Federal and the State Law advising their rights under Title [Subchapter] XIX 'free choice of vendor' pro-

vision and that they thus cannot be denied their right to remain in this facility by a state agency or its designate."

The Houston County Board took no action to remove any of the patients. On December 9, 1971, Mr. Rodvik presented bills to the county board reflecting the increased rate. Being told that these bills could not be paid, Rodvik revised the bills to the approved rate and accepted payment.

■ Plaintiff bases its claim against the state on two theories. First, it argues that the provider agreements obligate the state to follow the State Plan and the DPW guidelines in compensating plaintiff for its reasonable costs in providing nursing care services to public assistance beneficiaries. Second, it argues that the implementation of the freeze was carried out in an arbitrary and capricious manner.

The contractual relationship between nursing homes and the state is unique in that no reimbursement figure, be it a fixed per diem rate or schedule of maximum fees, is provided in the contract. Thus, our decision here has no application to other state contracts.

Plaintiff's situation is typical of that of medical assistance vendors under Medicaid. None of the approximately 33 welfare recipients in plaintiff's facility were placed there directly by the state. In the usual situation the potential recipient of assistance selects or enters the facility of his choice prior to or in conjunction with his application for assistance. If he is eligible for assistance, the state makes its payments directly to the vendor as required by the State Plan and by Minn. St. 256B.03. Although the prospect of assistance payments is most certainly an inducement for admitting welfare recipients into plaintiff's facility, the underlying agreement to provide services is between the patient and the nursing home. In the situation where state assistance levels are inadequate, plaintiff's remedy is to terminate its relationship with public assistance patients.

The individual vendor does have a judicial remedy when the action of the administrative agency is arbitrary, capricious, or

otherwise an abuse of discretion. Thus, the substance of this issue on appeal is whether the lack of legislative appropriation justified the imposition of the freeze on rates of recompense for medical services.

Minn. Const. art. 9, § 9, provides that "[n]o money shall ever be paid out of the treasury of this State except in pursuance of an appropriation by law." Art. 4, § 12, provides in part that "[n]o money shall be appropriated except by bill * * *." It is uncontested that the 1971 legislative appropriation to the Medical Assistance Program fell far short of meeting the demands of the providers of care. Minn. St. 6.23 provides:

"Unless otherwise expressly provided by law, no money belonging to or for the uses of the state shall be expended or applied by an official, department, or agency of the state government or any institution under its control, except under authority of an appropriation by law and or an allotment relating thereto as herein provided and upon warrant of the auditor."

Section 10.17 provides:

"When there has been an appropriation for any purpose it shall be unlawful for any state board or official to incur indebtedness on behalf of the board, the official, or the state in excess of the appropriation made for such purpose. It is hereby made unlawful for any state board or official to incur any indebtedness in behalf of the board, the official, or the state of any nature until after an appropriation therefor has been made by the legislature. Any official violating these provisions shall be guilty of a misdemeanor and the governor is hereby authorized and empowered to remove any such official from office."

Section 16.16, subd. 8, provides in part:

"No payment shall be made and no obligation shall be incurred against any fund, allotment, or appropriation unless the state auditor shall first certify that there is a sufficient unencumbered balance in such fund, allotment, or appropriation to meet the same."

The combined thrust of these statutory provisions and the constitutional prohibition demands actions in the nature of those taken by the DPW in 1971 when confronted with a cut in the legislative appropriation. There was no abuse of the DPW's administrative discretion in fulfilling the legislative and constitutional mandate.

■ Plaintiff charges that defendants' actions in implementing the freeze were arbitrary and capricious in that nursing homes only were affected and that plaintiff was treated differently from other nursing homes similarly situated. The trial court concluded that imposition of the freeze was neither arbitrary nor capricious and found that the freeze was applied to all categories of the Medical Assistance Program other than inpatient hospital services. On appeal, this court will not disturb the trial court's findings unless clearly erroneous. In Re Estate of Balafas, 293 Minn. 94, 198 N. W. 2d 260 (1972).

We have carefully reviewed the record, transcript, and arguments of counsel and conclude that the trial court's findings are consistent with the evidence.

Affirmed.