(No. 52982.–

THE METHODIST MEDICAL CENTER OF ILLINOIS, Appellant, v. ROBERT L. INGRAM, Township Supervisor, Appellee.

*Opinion filed November 18, 1980.*

Westervelt, Johnson, Nicoll & Keller, of Peoria (James D. Broadway and William E. Defenbaugh, of counsel), for appellant.

Bernard L. Oltman, of Pekin, for appellee.

Rex Carr, of Cohn, Carr, Korein, Kunin, Schlichter & Brennan, of East St. Louis, for *amicus curiae* St. Mary's Hospital of East St. Louis, Illinois, Inc.

Harry L. Kinser, Kenneth C. Robbins and Jeffrey W. Maysent, of Chicago (McLaughlin, Kinser & Bryant, of counsel), for *amicus curiae* Illinois Hospital Association.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Plaintiff, the Methodist Medical Center of Illinois (hereinafter referred to as the Center), brought this action in the circuit court of Tazewell County against Robert L. Ingram, supervisor of general assistance for Groveland Township, to recover charges of $3,545.80 for medical services which it provided to Robert L. Hunt III, a minor son of Robert L. Hunt, Jr. The circuit court granted plaintiff's motion for summary judgment. Defendant appealed and the appellate court reversed (78 Ill. App. 3d 944). We granted the Center's petition for leave to appeal.

The issues in this case arise in connection with the operation of this State's system of providing aid to the medically indigent as set forth in article VII of the Illinois Public Aid Code (Code) (Ill. Rev. Stat. 1977, ch. 23, par. 7—1 et seq.), which requires townships and other local governmental units to assist those unable to finance necessary medical care. Eligibility for assistance is determined in accordance with statewide standards established by the Department of Public Aid (Department) (Ill. Rev. Stat. 1977, ch. 23, pars. 7—1, 7—2). Section 7—2 of the Code also requires that in determining eligibility the amount which the applicant can contribute to the cost of necessary care is to be computed according to departmental standards. For those eligible, assistance can then be given in an amount equal to the difference between the amount which the applicant can contribute and the amount to which the hospital is entitled pursuant to a per diem rate determined by the Department. That per diem rate is at the heart of this controversy. It is apparently computed by the Department pursuant to the provisions of sections 5—5 and 5—7 of article V of the Code (Ill. Rev. Stat. 1977, ch. 23, pars. 5—5, 5—7). It is used, however, as a basis for payment of all in-patient hospital care furnished under the Code. A separate computation is made annually for each hospital

from data contained in the annual reports filed by each hospital; these reports may be amended quarterly if desired. The *per diem* rate so computed is somewhat lower than the hospital's usual and customary charges. Inflation, coupled with the fact that the rate is based upon the hospital's costs for the preceding year, widens the gap between the *per diem* rate and the hospital's customary charges. Aggravating the problem, it is said, is the absence from the article VII system of payments of the year-end two-way reconciliation of accounts which occurs under article V. Federal funds are used and Federal regulations apply to assistance given under article V, which concerns medical care for those already receiving financial assistance under other programs. Those regulations require the Department, in cases where the operating costs of the hospital have not been met, to reimburse the hospital for any deficit (apparently the difference between the *per diem* rate and a rate sufficient to pay the operating costs). Conversely, if the hospital has been overpaid, it must refund the overpayment to the Department. Under article VII, however, State and local funds are used; if the hospital is overpaid, refund to the State is required; but, if the *per diem* rate payments are insufficient to cover the actual operating costs of the hospital, no additional reimbursement is made. The resulting deficit spawned this litigation and other litigation pending in other courts of this State.

Article V of the Code is captioned "Medical Assistance." It is referred to in the briefs as providing a State "Medicaid" program, and its stated purpose is "to provide a program of essential medical care and rehabilitative services for persons receiving basic maintenance grants under this Code and for other persons who are unable, because of inadequate resources, to meet their essential medical needs" (Ill. Rev. Stat. 1977, ch. 23, par. 5—1). It seems to be undisputed that sections 5—5 and 5—7 of article V authorize the Department's *per diem* rate for use in

connection with medical care and services furnished under that article. Article VII is captioned "Local Aid To The Medically Indigent." It does not contain the express authority found in section 5—5 to "determine the quantity and quality of the medical assistance for which payment will be authorized" (Ill. Rev. Stat. 1977, ch. 23, par. 5—5) nor the authority to negotiate fees and rates contained in section 5—7 (Ill. Rev. Stat. 1977, ch. 23, par. 5—7). It is plaintiff's position that the *per diem* rate computed pursuant to the authority contained in article V cannot be applied to hospital charges for care furnished under article VII in the absence from the latter article of the express authority contained in the former. We do not agree.

In this case Robert L. Hunt III, a resident of Groveland Township, received medical care, part of which was of an emergency nature, at the Center from December 26, 1977, to January 12, 1978. His father, Robert L. Hunt, Jr., applied for assistance in paying his son's bill. The Center forwarded the application to Supervisor Ingram, who determined that the Hunts were qualified for assistance under article VII of the Illinois Public Aid Code (Ill. Rev. Stat. 1977, ch. 23, par. 7—1 *et seq.*), that the 17 days of care at the Center should be reimbursed to the extent of $2,747 (which is, to the nearest dollar, 17 times $161.60, which Ingram believed to be the "*per diem*" rate specified for the Center in the Department regulations) and that Hunt had "available" resources of $2,156. Ingram tendered the Center $591 in full payment of the bill, after deducting the $2,156 which the Center could obtain from Hunt pursuant to section 11—13 of the Code (Ill. Rev. Stat. 1977, ch. 23, par. 11—13). Section 11—13 bars a supplier who accepts a direct Department payment on behalf of an aid recipient from recovering any additional payment except the amount which the Department's regulations specify is to be met from the aid recipient's "available" income and resources. The Center refused

to accept Ingram's payment and instituted this action.

Plaintiff has cited in support of its position only four cases: *Sisters of the Third Order of St. Francis v. Groveland Township* (1972), 7 Ill. App. 3d 278; *Pekin Memorial Hospital v. Shilling* (1970), 121 Ill. App. 2d 473; *St. John's Hospital v. Town of Capitol* (1966), 75 Ill. App. 2d 222, and *Rockford Memorial Hospital Association v. Whaples* (1960), 25 Ill. App. 2d 79, none of which discusses the issue here. Plaintiff apparently refers to these four cases because they involve judgments for the full amount of the hospital charges. That is totally unpersuasive, however, for the hospital services in each of those cases were furnished long prior to November 1, 1971, the date upon which use of the *per diem* rate was apparently first required. Nor do we regard *Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, as indicating the absence of departmental authority to adopt the challenged regulations. We there held the Director of the Department could not suspend vendors from participation in the medical assistance program because of the total absence from the statute of any indication of an intent to confer such authority and the presence of provisions delegating enforcement responsibilities to others.

Neither the parties nor *amici,* the State of Illinois, the Illinois Hospital Association and St. Mary's Hospital of East St. Louis, Illinois, Inc., have cited, nor have we found, any Illinois authority on the precise issue before us. Consequently, its resolution must depend upon the legislative purpose and intent to be gleaned from the statutory language.

The pertinent sections of article VII demonstrate the General Assembly's intent to therein provide for only such assistance as may be necessary to provide needed care for those eligible persons whose financial resources are inadequate and who are not receiving assistance under some other public program. Section 7–2 is particularly relevant to our issue. It provides:

"The person shall be given such care as may be necessary and proper, including transportation, and if he dies he shall be decently buried.

The amount and nature of the care provided shall be determined in accordance with a uniform standard of eligibility established by the Illinois Department and its rules and regulations. However, the amount and nature of any such care is not affected by the payment of any grant under the 'Senior Citizens and Disabled Persons Property Tax Relief Act'. The standard shall include provision for determining what, if any, portion of the income, property or other resources of an applicant or recipient is available to meet the cost of necessary care. However, a local governmental unit not receiving State funds for purposes of this Article may prescribe a uniform standard of eligibility according to local conditions. Such locally prescribed standards may be less, but not more, restrictive than the uniform standard of eligibility established by the Illinois Department." (Ill. Rev. Stat. 1977, ch. 23, par. 7—2.)

This section contemplates that eligible persons be given "such care as may be necessary and proper," *i.e.*, proper under the uniform standard the section requires the Department to formulate. The Department's standard is to determine "[t]he amount and nature of the care provided." The statement, "The standard shall include provision for determining what, if any, portion of the income, property or other resources of an applicant or recipient is available to meet the cost of necessary care" indicates that the standard is to include, but is not to be limited to, income limits of eligibility. Rather, section 7—1.2 indicates that one means by which the Department may regulate the "amount and nature of the care provided" pursuant to section 7—2 is by defining the "cost of necessary care":

"The money, property, or other resources available to the person, including support available from legally responsible relatives, must be insufficient to meet the costs of necessary care, as defined by standards established in accordance with Section 7—2 of this Article. The eligibility of any applicant for or recipient of public aid under this Article is not affected by the payment of any grant under

the 'Senior Citizens and Disabled Persons Property Tax Relief Act.' " Ill. Rev. Stat. 1977, ch. 23, par. 7—1.2.

The word "defined" can be reasonably read as referring only to "costs of necessary care," the nearest words. It would be a strained reading of the section to do otherwise. The regulatory scheme provided by article VII is that the local governments will provide "aid" in meeting "costs of necessary care," as that term is defined in regulations of the Department pursuant to section 7—2, in order that all eligible persons in the State be given "such care as may be necessary and proper" under statewide supervision by the Department.

Article XII of the Illinois Public Aid Code (Ill. Rev. Stat. 1977, ch. 23, par. 12—1 *et seq.*), which deals more generally with the Department's responsibility for the administration of the Illinois Public Aid Code, also indicates that the Department has authority for the challenged regulations. Section 12—3 states:

"As provided in Articles VI and VII, Local Governmental units shall provide funds for and administer the programs provided in those Articles, subject, where so provided, to the supervision of the Illinois Department." (Ill. Rev. Stat. 1977, ch. 23, par. 12—3.)

Although we have found authority for the Department's regulation within article VII itself, we note that the section 12—3 phrase "where so provided" should not be read to restrict the Department's supervision to matters expressly committed to that supervision in articles VI and VII, particularly in view of the section's two preceding phrases "[a]s provided in Articles VI and VII," and "provided in those Articles." If the legislature had wished to limit the supervision as plaintiff suggests, it would have repeated one of those two earlier phrases. Plaintiff's restrictive reading of section 12—3 is also completely at odds with the broad authority conferred upon the Department with respect to article VII aid by section 12—21.17, which states in part:

"The administration of public aid by local governmental units under Article VII shall be subject in all instances to the supervision and rules and regulations of the Illinois Department." Ill. Rev. Stat. 1977, ch. 23, par. 12—21.17.

The challenged regulations adopted by the Department are as follows:

PO—105, which provides in part:

"All provisions of this manual are binding on all local governmental units in which Aid to the Medically Indigent is administered by the Department. All other local governmental units must comply with all provisions of this manual unless they have written alternative manual provisions and have received approval of such alternative provisions from the Department." (Ill. Gen. Assist. Man. PO—105.)

(It was stipulated by the parties the Groveland Township has no "written alternative manual.") PO—1115.1(e), which provides in part:

"Payment for in-patient hospital care in participating hospitals is made at the all-inclusive per diem rate established by the Department." (Ill. Gen. Assist. Man. PO—1115.)

Both the earlier-quoted statutory provision and these regulations evince a legitimate concern with the costs of medical care. An obvious purpose of the *per diem* rate is to insure that public funds will not be dissipated by the payment of unnecessarily or unreasonably high charges for medical services. While the hospitals represented here are not-for-profit corporations, that fact does not guarantee the reasonableness of their operating costs or the efficiency of their operations. Given the quoted statutory provisions, the purpose of article VII, and the State's interest in efficiently and economically operating its huge medical assistance program, we believe the Department has not exceeded its authority in applying the *per diem* rate developed under article V to the article VII aid to the medically indigent program. The regulations requiring

such action are directly related to, and serve to implement, the legislative intent to limit the expenditure of public funds to only such as may be required to provide necessary care. Use of the *per diem* rate is the Department's method of defining the costs of necessary care as authorized in section 7—1.2.

St. Mary's Hospital argues as an *amicus curiae* that the Department's regulations fixing the plaintiff's article VII remuneration at the *per diem* rate fixed by the Department under article V is unconstitutional. The argument is that this regulation, combined with section 11—13 of the Code (Ill. Rev. Stat. 1977, ch. 23, par. 11—13) and the provisions of "An Act requiring hospitals to render hospital emergency service ***" operates to deprive hospitals of property without due process. That act, hereafter referred to as the Emergency Services Act, states:

> Every hospital required to be licensed by the Department of Public Health pursuant to the Hospital Licensing Act, approved July 1, 1953, as now or hereafter amended, which provides general medical and surgical hospital services shall provide a hospital emergency service in accordance with rules and regulations adopted by the Department of Public Health and shall furnish such hospital emergency services to any applicant who applies for the same in case of injury or acute medical condition where the same is liable to cause death or severe injury or serious illness." (Ill. Rev. Stat. 1977, ch. 111½, par. 86.)

In this case an undisclosed portion of the medical services given were of an emergency nature. St. Mary's indicates approximately 30% of its patients are given emergency care, although how many of these qualify for aid to the medically indigent is not disclosed. In terms of the effect of the *per diem* rate, a distinction can probably be drawn between emergency and nonemergency patients, in that longer-term care is generally given the nonemergency cases which comprise the substantial majority of hospitalized patients. (See *Joyner v. Alton Ochsner Medical Foundation* (La. App. 1970), 230 So. 2d 913.) As to non-

emergency patients the Emergency Services Act imposes no duty upon hospitals to provide care. The relevance of this is that what facts we have before us would seem to indicate that the underpayment complained of by plaintiff arises principally in connection with the care of long-term, nonemergency patients whose care is not compelled by the statute. While we agree that the combination of underpayment for compelled services rendered indigents can be cast in due process terms, we do not agree that it has been established that the circumstances here attain that stature. If the rate of remuneration is judged annually by the hospitals to be adequate to cover costs of article V patients, we believe that the plaintiff cannot, without more, argue that the application of those rates to article VII patients amounts to a deprivation of property without due process.

As earlier noted the purpose of the *per diem* rate is to promote economy and efficiency in the provision of medical care to the recipients of assistance under the statute, a legitimate State interest. Since we have held use of that rate was authorized in measuring the reasonable cost of medical care under article VII, plaintiff bears the burden of overcoming the presumed validity of that use. (*Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 303; *North Shore Post No. 21 v. Korzen* (1967), 38 Ill. 2d 231, 233.) Absent a specific showing of the extent to which the deficits complained of are attributable to the emergency care of article VII patients, an arguable due process claim is simply not presented. (See *Massachusetts General Hospital v. Weiner* (1st Cir. 1978), 569 F.2d 1156, 1161.) As to the nonemergency article VII patients, there exists no State-created compulsion to provide care, and plaintiff's remedy may well be "the choice of either making [its] operation more efficient or not accepting [article VII] patients" *In re Sigety v. Ingraham* (1971), 29 N.Y.2d 110, 115, 272 N.E.2d 524, 527, 324 N.Y.S.2d

10, 14 see also *LaCrescent Constant Care Center, Inc. v. State* (1974), 301 Minn. 229, 235-37, 222 N.W.2d 87, 91; *Briarcliff Haven, Inc. v. Department of Human Resources* (N.D. Ga.), 403 F. Supp. 1355, 1364.

St. Mary's cites five railroad- and utility-rate cases in support of its argument. We find them readily distinguishable. *Fleming v. Illinois Commerce Com.* (1944), 388 Ill. 138, *Illinois Central R.R. Co. v. Illinois Commerce Com.* (1944), 387 Ill. 256, and *Mt. Carmel Public Utility & Service Co. v. Public Utilities Com.* (1921), 297 Ill. 303, all involved challenges by railroads and a utility to rates for separable branches of their businesses (suburban service in *Fleming* and *Illinois Central* and heating service in *Mt. Carmel*) which had been set with reference solely to income statistics for their entire systems, when those statistics did not accurately reflect the situation of the branches. These cases turned on the separate character of the services involved. Similarly in *Northern Pacific Ry. Co. v. Department of Public Works* (1925), 268 U.S. 39, 69 L. Ed. 836, 45 S. Ct. 412, and *Banton v. Belt Line Ry. Corp.* (1925), 268 U.S. 413, 69 L. Ed. 1020, 45 S. Ct. 534, the United States Supreme Court had occasion to consider rates of separate traffic (log traffic wholly within the State of Washington in *Northern Pacific* and transfer passengers on a street railroad in *Banton*). In the present case, even if we believed the situation of railroads and utilities to be apposite to the situation of hospitals, which we do not, there has been no showing by plaintiff that article VII patients can properly be considered a separate branch of the hospital's business. Rather it appears that article VII patients use the same facilities in the same manner and to the same extent as the rest of the hospital's patients.

In focusing on its due process argument, plaintiff and *amici* have almost completely ignored the broad scope of the State's police power in the area of health. That power

is sufficient to justify, in proper circumstances, uncompensated deprivation of personal liberty as well as deprivation of property. (*People ex rel. Baker v. Strautz* (1944), 386 Ill. 360.) The States have wide regulatory power with respect to the practice of health care professions. (*Barsky v. Board of Regents* (1954), 347 U.S. 442, 98 L. Ed. 829, 74 S. Ct. 650; *Klein v. Department of Registration & Education* (1952), 412 Ill. 75, *cert. denied* (1952), 344 U.S. 855, 97 L. Ed. 664, 73 S. Ct. 93. See also *Goldfarb v. Virginia State Bar* (1975), 421 U.S. 773, 44 L. Ed. 2d 572, 95 S. Ct. 2004.) Although this court has found foreign-educated doctors had property rights in their State "hospital permits," the termination of those rights has been upheld against a challenge based on the due process clause:

"The fact that the plaintiffs possess property rights and are entitled to due process protection, however, does not mean that those rights cannot be affected by State legislation. \*\*\*. The demands of due process are proportional to the weight of the interest being protected in balancing that interest against the countervailing interests of society. (*Powell v. Jones,* 56 Ill. 2d 70, 78.) If, after balancing these interests, the State's exercise of its police power is deemed to be reasonable, the legislation in question must be upheld." (*Rios v. Jones* (1976), 63 Ill. 2d 488, 497.)

This court has also indicated that the State's police power to exclude persons from engaging in a particular business generally includes the power to permit the activity on conditions reasonably related to protection of the general welfare. (*City of Decatur v. Chasteen* (1960), 19 Ill. 2d 204.) In our judgment the scope of the State's police power clearly encompasses the power to impose on hospitals licensed by it conditions reasonably designed to promote public health and safety. The New York Court

of Appeals has even indicated the "legitimate legislative purposes of promoting public health, welfare and safety" could authorize the imposition of direct cost regulations upon hospitals in order to control health care costs which were escalating more rapidly than almost any other component of the cost-of-living index. *People ex rel. Whalen v. Woman's Christian Association* (1978), 44 N.Y.2d 466, 471, 377 N.E.2d 725, 727-28, 406 N.Y.S.2d 272, 274.

We accordingly hold that use of the *per diem* rate is authorized for article VII patients, and that, considering the scope of the State's police power, the circumstances before us do not establish the use of that rate to constitute a denial of due process to the involved hospitals.

The judgment of the appellate court is affirmed.

*Judgment affirmed.*