(No. 69278.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. HENRIETTA ADAMS *et al.*, Appellees.

*Opinion filed July 30, 1992.*

332

Cecil A. Partee and Jack O'Malley, State's Attorneys, and Robert M. Portman and Renee Goldfarb, Assistant State's Attorneys, of Chicago, for the People.

John R. Hammell, Timothy S. Bishop and Harvey Grossman, of Chicago, for appellees.

Sylvia A. Law, of New York, New York, and Elizabeth Hubbard, of Chicago, for *amici curiae* The Center for Women Policy Studies *et al.*

James D. Holzhauer, of Mayer, Brown & Platt, of Chicago, for *amici curiae* Illinois Public Health Association *et al.*

CHIEF JUSTICE MILLER delivered the opinion of the court:

In separate proceedings in the circuit court of Cook County, the defendants, Henrietta Adams and Peggy Madison, were convicted of prostitution. Pursuant to section 5—5—3(g) of the Unified Code of Corrections, the defendants were ordered to undergo medical testing to determine whether they were carriers of the human immunodeficiency virus (HIV), the cause of acquired immunodeficiency syndrome (AIDS). (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(g).) Rather than submit to the court-ordered tests, the defendants filed motions challenging the constitutionality of section 5—5—3(g). Following a hearing, the trial judge determined that the testing procedure represented an illegal search and seizure and denied the defendants equal protection. Because the statute was declared unconstitutional, the State's appeal from that ruling lies directly to this court. (134 Ill. 2d R. 603.) For the reasons that follow, we reverse the judgment of the circuit court and remand these consolidated actions for further proceedings.

Section 5—5—3(g) of the Unified Code of Corrections provides as follows:

> "Whenever a defendant is convicted of an offense under Sections 11—14 [prostitution], 11—15 [soliciting for a prostitute], 11—15.1 [soliciting for a juvenile prostitute], 11—16 [pandering], 11—17 [keeping a place of prostitution], 11—18 [patronizing a prostitute], 11—19 [pimping], 11—19.1 [juvenile pimping], 11—19.2 [exploitation of a child], 12—13 [criminal sexual assault], 12—14 [aggravated criminal sexual assault], 12—15 [criminal sexual abuse] or 12—16 [aggravated criminal sexual abuse] of

the Criminal Code of 1961, the defendant shall undergo medical testing to determine whether the defendant has any sexually transmissible disease, including a test for infection with human immunodeficiency virus (HIV) or any other identified causative agent of acquired immunodeficiency syndrome (AIDS). Any such medical test shall be performed only by appropriately licensed medical practitioners and may include an analysis of any bodily fluids as well as an examination of the defendant's person. Except as otherwise provided by law, the results of such test shall be kept strictly confidential by all medical personnel involved in the testing and must be personally delivered in a sealed envelope to the judge of the court in which the conviction was entered for the judge's inspection in camera. Acting in accordance with the best interests of the victim and the public, the judge shall have the discretion to determine to whom, if anyone, the results of the testing may be revealed. The court shall order that the cost of any such test shall be paid by the county and may be taxed as costs against the convicted defendant." Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(g).

The procedural facts of these consolidated cases may be stated briefly. Defendant Henrietta Adams was charged with prostitution, a violation of section 11—14 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 11—14). In a bench trial, Adams was found guilty of that offense and was sentenced to a term of probation. As a condition of her sentence, Adams was ordered to undergo an HIV test pursuant to section 5—5—3(g) of the Unified Code of Corrections.

In a separate proceeding, defendant Peggy Madison was similarly charged with prostitution. Madison pleaded guilty to the charge and was sentenced to a term of probation. Like Adams, Madison was ordered to undergo an HIV test pursuant to section 5—5—3(g).

The defendants refused to submit to the HIV tests and instead challenged those portions of their respective probationary orders. The matters were then consolidated

for purposes of further proceedings. The defendants raised a variety of constitutional grounds in support of their contention, arguing that the statute violated their rights to privacy, to freedom from unreasonable searches and seizures, and to the equal protection of the laws, as guaranteed by the United States and Illinois Constitutions (U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, §§2, 6), and, in addition, that the testing requirement was cruel and unusual punishment, in violation of the eighth amendment of the United States Constitution (U.S. Const., amends. VIII, XIV).

The parties submitted extensive memoranda on the issues, and an evidentiary hearing was held. At the hearing, the defendants presented the testimony of three expert witnesses, who questioned the utility of the testing requirement for persons convicted of prostitution. The witnesses were Dr. Renslow Sherer, chair of the Governor's Task Force on Aids; Colleen Ahler, director of the AIDS program at Genesis House, a social services agency that works with women in prostitution; and Dr. John Raba, medical director at Cermak Health Services, which provides medical services to the Cook County Department of Corrections. These witnesses believed that mandatory HIV testing of sex offenders is ineffective and may even be counterproductive to the effort to stop the spread of AIDS, particularly among women in prostitution. The testimony of these witnesses is discussed in greater detail later in this opinion.

The trial judge took the matter under advisement at the conclusion of the hearing. Later, in a written opinion, the judge ruled that the HIV testing statute violated the fourth amendment's guarantee against unreasonable searches and seizures and denied the defendants their fourteenth amendment right to equal protection of the laws. The trial judge did not expressly declare that the statute violated the corresponding provisions of the Illi-

nois Constitution. The trial judge rejected the defendants' contention that the testing requirement constituted cruel and unusual punishment under the eighth amendment. In light of his conclusion that the testing requirement was an invalid search, the trial judge found it unnecessary to rule on the defendants' additional contention that the statute violated their right to privacy. Because the trial judge found the testing requirement unconstitutional, he removed it from the terms of the defendants' probationary orders.

The State has appealed the trial judge's ruling directly to this court. (See 134 Ill. 2d R. 603.) We granted leave to a number of groups and organizations to submit briefs as *amici curiae*. (See 134 Ill. 2d R. 345.) The parties present two issues for our review: whether the HIV testing requirement found in section 5—5—3(g) of the Unified Code of Corrections constitutes an invalid search and seizure, and whether the statute denies the defendants equal protection of the laws.

I

AIDS is a fatal illness for which there is no known cure. AIDS can be spread through the exchange of bodily fluids, as in sexual intercourse, in the sharing of needles by intravenous drug users, during pregnancy or childbirth, and through the donation of blood, organs, or semen. Section 5—5—3(g) does not specify a particular test to be used to determine whether the individual has HIV. The testimony introduced below, as well as the medical literature and the case law, however, refer to two tests that are used in combination to determine whether a person has been exposed to the causative virus. One is the enzyme-linked immunosorbent assay (ELISA). If the result of that test is positive, a second procedure, the Western Blot test, is then performed to confirm the initial result. The tests do not detect the vi-

rus itself but rather the presence of antibodies created by the body in response to the virus. The tests are considered to be reasonably accurate. Because there is a latency period of variable length, during which an individual does not immediately produce antibodies in response to exposure to HIV, a negative test does not necessarily mean that the person has not been exposed to the virus.

The present statute took effect on January 1, 1988. It was among a series of laws enacted by our General Assembly in response to the growing AIDS crisis. A companion provision, section 5—5—3(h) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(h)), contains a similar requirement for mandatory HIV testing of persons convicted of certain offenses under the Hypodermic Syringes and Needles Act (Ill. Rev. Stat. 1989, ch. 38, pars. 22—50 through 22—55). The appellate court has upheld the constitutionality of section 5—5—3(h) in *People v. C.S.* (1991), 222 Ill. App. 3d 348. Together, then, sections 5—5—3(g) and (h) target, for purposes of mandatory testing, two major groups at risk of contracting AIDS: sex offenders and intravenous drug users. We note, too, that a number of other States have enacted similar laws imposing mandatory testing on persons convicted of certain offenses involving sexual misconduct. (See Cal. Penal Code §1202.6 (Deering Supp. 1992); Colo. Rev. Stat. Ann. §18—7—201.5 (West Supp. 1991); Fla. Stat. Ann. §796.08 (West Supp. 1992); Ky. Rev. Stat. Ann. §529.090 (Baldwin Supp. 1991); Nev. Rev. Stat. §201.356 (1991); S.C. Code Ann. §16—15—255 (Law. Co-op. Supp. 1991); Va. Code Ann. §18.2—346.1 (Michie Supp. 1991); Wash. Rev. Code Ann. §70.24.340 (West Supp. 1992).) The California statute was upheld against similar constitutional challenge in *Love v. Superior Court* (1990), 226 Cal. App. 3d 736, 276 Cal. Rptr. 660.

We note at the outset the scope of the issues before us. Although section 5—5—3(g) of the Unified Code of Corrections requires testing "to determine whether the defendant has any sexually transmissible disease," we are concerned here with only that portion of the statute specifically requiring testing for HIV. In addition, although conviction for any of a number of different offenses will trigger the testing requirement of section 5—5—3(g), the present defendants were charged with and found guilty of only one of the enumerated offenses, prostitution. Thus, the present cases involve only that portion of the statute requiring that persons convicted of prostitution undergo testing for HIV, and we limit our discussion accordingly.

As a general principle, legislative enactments are presumed to be constitutional, and a party challenging a statute has the burden of establishing its invalidity. (*Bernier v. Burris* (1986), 113 Ill. 2d 219, 227.) Doubts concerning a statute's constitutionality will be resolved in favor of its validity. (*Agran v. Checker Taxi Co.* (1952), 412 Ill. 145, 148.) Our task here is to determine only whether the challenged legislation is constitutional, and not whether it necessarily provides the best or most effective means of curtailing the spread of the disease.

In support of the circuit judge's ruling, the defendants contend that the statutorily mandated HIV test is an unreasonable search and seizure, in violation of both the fourth amendment of the United States Constitution, as applied to the States, and article I, section 6, of the Illinois Constitution (U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, §6). The defendants also contend that the statute violates the equal protection clauses of the United States and Illinois Constitutions. (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §§2, 18.) We shall consider these arguments in turn.

## II

The trial judge found that the personal intrusion required by the HIV testing statute is unreasonable under the fourth amendment because the statute fails to require any individualized suspicion that the person to be tested is a carrier of HIV and, furthermore, because the intended social benefits of the testing mandate are outweighed by the individual privacy interests infringed by the statute's operation.

As an initial matter, we note that the challenged provision is a public health measure and thus involves a field in which the States exercise broad regulatory and administrative powers. Like other measures intended to enhance public health and community well-being, governmental action designed to control the spread of disease falls within the scope of the State's police powers. Traditionally, the States have been allowed broad discretion in the formulation of measures designed to protect and promote public health. (See *Jacobson v. Massachusetts* (1905), 197 U.S. 11, 24-25, 49 L. Ed. 643, 649, 25 S. Ct. 358, 360-61; *People v. Kohrig* (1986), 113 Ill. 2d 384, 397; *Methodist Medical Center v. Ingram* (1980), 82 Ill. 2d 511, 522-23; *People ex rel. Baker v. Strautz* (1944), 386 Ill. 360, 364-65.) "The mode or manner in which those results are to be accomplished is within the discretion of the state, subject, of course, so far as Federal power is concerned, only to the condition that no rule prescribed by a state, nor any regulation adopted by a local governmental agency acting under the sanction of state legislation, shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument." (*Jacobson*, 197 U.S. at 25, 49 L. Ed. at 649, 25 S. Ct. at 361.) Thus, the broad mantle of public health does not shield such measures from all scrutiny, for the police power may not be used "to vio-

late a positive constitutional mandate." *Quilici v. Village of Morton Grove* (7th Cir. 1982), 695 F.2d 261, 268.

The protections afforded by the fourth amendment are not limited to investigations of criminal conduct but may apply to governmental activities in civil contexts as well. (See *New Jersey v. T.L.O.* (1985), 469 U.S. 325, 335, 83 L. Ed. 2d 720, 730-31, 105 S. Ct. 733, 739 (public school officials); *O'Connor v. Ortega* (1987), 480 U.S. 709, 714-15, 94 L. Ed. 2d 714, 721, 107 S. Ct. 1492, 1495-96 (governmental employer); *Camara v. Municipal Court* (1967), 387 U.S. 523, 530, 18 L. Ed. 2d 930, 936, 87 S. Ct. 1727, 1731 (municipal building inspectors).) Thus, the governmental action challenged here, even though it is carried out for a purpose unrelated to routine criminal investigation, may still raise fourth amendment concerns.

The defendants argue, and the State agrees, that the taking and testing of a blood sample from an individual pursuant to the present statute is a search under the fourth amendment. (*Skinner v. Railway Labor Executives' Association* (1989), 489 U.S. 602, 616, 103 L. Ed. 2d 639, 659, 109 S. Ct. 1402, 1412; *Schmerber v. California* (1966), 384 U.S. 757, 767, 16 L. Ed. 2d 908, 918, 86 S. Ct. 1826, 1834.) The test required by the statute implicates the fourth amendment in two separate respects. First, the drawing of the blood sample is itself an intrusion on the individual's bodily integrity. Second, the performance of the test on the sample also implicates fourth amendment interests. Discussing a similar laboratory procedure, blood tests used to detect the presence of alcohol in a person's bloodstream, the Supreme Court has explained:

> "In light of our society's concern for the security of one's person [citation], it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reason-

able. The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested employee's privacy interests. [Citation.]" (*Skinner*, 489 U.S. at 616, 103 L. Ed. 2d at 659, 109 S. Ct. at 1412.)

Thus, the statutorily authorized blood test at issue in this case is a search for fourth amendment purposes, and the governmental action in administering the test must therefore satisfy the applicable fourth amendment requirements if the statute is to survive constitutional scrutiny.

"[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." (*Skinner*, 489 U.S. at 619, 103 L. Ed. 2d at 661, 109 S. Ct. at 1414.) Accordingly, we must determine whether the intrusion mandated by the HIV testing statute is a reasonable one, when it is measured against the applicable fourth amendment standards. "The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.' " (*New Jersey v. T.L.O.* (1985), 469 U.S. 325, 337, 83 L. Ed. 2d 720, 731, 105 S. Ct. 733, 740, quoting *Camara v. Municipal Court* (1967), 387 U.S. 523, 536-37, 18 L. Ed. 2d 930, 940, 87 S. Ct. 1727, 1735.) As a general matter, the balance that is struck between these interests requires that the search or seizure be conducted pursuant to a warrant issued by a neutral magistrate upon a showing of probable cause. *Skinner*, 489 U.S. at 619, 103 L. Ed. 2d at 661, 109 S. Ct. at 1414; *Payton v. New York* (1980), 445 U.S. 573, 586, 63 L. Ed. 2d 639, 651, 100 S. Ct. 1371, 1380.

A warrant and individualized suspicion are not always necessary, however, to sustain the validity of a governmental intrusion challenged on fourth amendment grounds. (*T.L.O.*, 469 U.S. at 340-41, 83 L. Ed. 2d at 733-34, 105 S. Ct. at 742.) Special governmental needs,

beyond the normal needs of law enforcement, may in appropriate cases justify a fourth amendment intrusion conducted without either of those traditional safeguards. (*National Treasury Employees Union v. Von Raab* (1989), 489 U.S. 656, 665, 103 L. Ed. 2d 685, 702, 109 S. Ct. 1384, 1390; *Griffin v. Wisconsin* (1987), 483 U.S. 868, 873-74, 97 L. Ed. 2d 709, 717, 107 S. Ct. 3164, 3168; *T.L.O.*, 469 U.S. at 351, 83 L. Ed. 2d at 741, 105 S. Ct. at 747 (Blackmun, J., concurring).) "When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable cause requirements in the particular context." *Skinner*, 489 U.S. at 619, 103 L. Ed. 2d at 661, 109 S. Ct. at 1414.

In *Skinner*, the Supreme Court upheld, under the "special needs" exception, a program of mandatory, suspicionless drug and alcohol testing applicable to railway employees involved in work-related accidents. Similarly, in *Von Raab*, the Court applied the same exception to uphold a program of mandatory, suspicionless drug testing for Customs Service employees who sought transfer or promotion to positions directly involving the interdiction of illicit drugs or to positions requiring the carrying of a firearm. Courts have also determined that mandatory HIV testing for particular persons or limited groups of persons may withstand fourth amendment scrutiny. (*Dunn v. White* (10th Cir. 1989), 880 F.2d 1188 (prisoners); *Plowman v. United States Department of the Army* (E.D. Va. 1988), 698 F. Supp. 627 (surgical patient in military hospital); *Love v. Superior Court* (1990), 226 Cal. App. 3d 736, 276 Cal. Rptr. 660 (persons convicted of prostitution); *Johnetta J. v. Municipal Court* (1990), 218 Cal. App. 3d 1255, 267 Cal. Rptr. 666 (person who bit sheriff's deputy). *Contra Glover v. Eastern Nebraska Community Office of Retardation* (8th Cir. 1989), 867 F.2d 461 (employees of social services agencies working

with mentally retarded persons).) The State contends that the mandatory testing scheme at issue here, like the programs approved in *Skinner* and *Von Raab*, satisfies fourth amendment requirements because it serves to advance special governmental needs while imposing only a minor burden on personal privacy. To resolve this question, we must balance the importance of the State's interest to be achieved under the statute against the nature and scope of this intrusion on individuals' fourth amendment interests.

The challenged statute concerns matters lying at the heart of the State's police power. There are few, if any, interests more essential to a stable society than the health and safety of its members. Toward that end, the State has a compelling interest in protecting and promoting public health and, here, in adopting measures reasonably designed to prevent the spread of AIDS. "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." (*Jacobson v. Massachusetts* (1905), 197 U.S. 11, 27, 49 L. Ed. 643, 650, 25 S. Ct. 358, 362.) As we have noted, States enjoy broad discretion in devising means to protect and promote public health. (*Jacobson*, 197 U.S. at 24-25, 49 L. Ed. at 649, 25 S. Ct. at 360-61; *Methodist Medical Center v. Ingram* (1980), 82 Ill. 2d 511, 522-23; *People ex rel. Baker v. Strautz* (1944), 386 Ill. 360, 364-65.) Although these concerns do not immunize the challenged provision from constitutional scrutiny, they do indicate the broad sweep of the State's power in this area, and the compelling nature of that governmental interest.

The HIV testing statute is designed to serve a public health goal, rather than the ordinary needs of law enforcement. The manifest purpose of section 5—5—3(g) is to help control the spread of AIDS by identifying per-

sons infected with the causative virus. The General Assembly has targeted at-risk groups, concentrating on sex offenders and, in companion legislation, illicit users of hypodermic syringes (see Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(h)). The results of the test are to remain confidential, subject to the discretion of the trial judge, who, "[a]cting in accordance with the best interests of the victim and the public," may authorize disclosure of the test results to others. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(g).) Once persons who are carriers of the virus have been identified, the victims of their conduct and the offenders themselves can receive necessary treatment, and, moreover, can adjust their conduct so that other members of the public do not also become exposed to HIV. In this way, the spread of AIDS through the community at large can be slowed, if not halted. We believe that the HIV testing requirement advances a special governmental need. See *Love v. Superior Court* (1990), 226 Cal. App. 3d 736, 743, 276 Cal. Rptr. 660, 664 (upholding California law requiring HIV testing of persons convicted of prostitution).

Having identified the important governmental purpose served by the statute, we must next balance that interest against the intrusion on personal freedom effected by the statute. The requirement of a warrant protects individual privacy "by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of governments agents." (*Skinner*, 489 U.S. at 621-22, 103 L. Ed. 2d at 663, 109 S. Ct. at 1415.) In addition, the warrant requirement interposes between government and citizen the neutral judgment of a magistrate, charged with the independent assessment of the facts and circumstances assertedly justifying the particular intrusion. (*Skinner*, 489 U.S. at 622, 103 L. Ed. 2d at 663, 109 S. Ct. at 1415.) We do not believe that these purposes would be served by imposing here a

separate requirement that the State secure a warrant before subjecting an individual to a test pursuant to the statute.

As the proceedings in these consolidated matters illustrate, an order directing a defendant to submit to testing under section 5—5—3(g) will customarily be entered by the presiding judge at the sentencing hearing, or at some other point following the defendant's conviction. The statute specifies the precise circumstances in which a test for HIV may be compelled. The testing requirement is automatically triggered upon a defendant's conviction for one of the offenses enumerated in the provision; in that case, the defendant must undergo testing for HIV, as well as for other sexually transmissible diseases. Beyond these limited circumstances, however, the statute contains no authority by which a judge may compel an individual to undergo a test for HIV. Thus, section 5—5—3(g) affords the court no discretion in determining whom to test. Under this statutory regimen, there would be nothing for the presiding judge, or other magistrate, to weigh if issuance of a warrant were to be required. (See *Von Raab*, 489 U.S. at 667, 103 L. Ed. 2d at 703, 109 S. Ct. at 1391.) The only discretionary function allowed by the statute lies in determining to whom the results of the test may be revealed. As the statute makes clear, however, that determination must be made by the court.

Even if a warrant is not required, probable cause, or some individualized suspicion, generally will be necessary to sustain the validity of a search or seizure challenged on fourth amendment grounds. (*Skinner*, 489 U.S. at 624, 103 L. Ed. 2d at 664, 109 S. Ct. at 1416.) But when the intrusion is minimal and an important governmental interest would be jeopardized by requiring individualized suspicion, a search may be deemed reasonable even

though such suspicion is lacking. *Skinner*, 489 U.S. at 624, 103 L. Ed. 2d at 664, 109 S. Ct. at 1417.

As we have stated, the purpose of the HIV testing statute is to protect public health by preventing the spread of AIDS among the members of the community. In this context, when the challenged intrusion is intended to prevent the spread of a dangerous condition providing few articulable grounds for a search, other than categories of risk, and thus advances an important function that is related to administrative concerns of public health and safety, rather than to the concerns of criminal investigation, individualized suspicion may become less important. As the Court noted in *Von Raab*:

> "Our precedents have settled that, in certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." (*Von Raab*, 489 U.S. at 668, 103 L. Ed. 2d at 704, 109 S. Ct. at 1392.)

The aim of section 5—5—3(g) is not to ferret out evidence of misconduct but rather to provide reliable information concerning the HIV status of sex offenders, and possibly their victims. In view of this important public health mission, we consider that the State's interest in conducting suspicionless testing outweighs the individual's interest in requiring some degree of individualized suspicion.

The actual physical intrusion required by the HIV testing statute is relatively slight and poses no threat to the health or safety of the individual tested. The procedure involves the drawing of a sample of blood, and the test may be performed "only by appropriately licensed medical practitioners" (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(g)). Such tests are performed safely and routinely many times during a person's life. (See *Breithaupt*

*v. Abram* (1957), 352 U.S. 432, 436, 1 L. Ed. 2d 448, 451, 77 S. Ct. 408, 410 ("The blood test procedure has become routine in our everyday life").) Discussing the use of blood tests to detect the presence of alcohol in a driver's bloodstream, the Supreme Court has observed:

"Such tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." *Schmerber v. California* (1966), 384 U.S. 757, 771, 16 L. Ed. 2d 908, 920, 86 S. Ct. 1826, 1836.

The test challenged in this case is a minor, routine laboratory procedure, and it poses no threat to the health or safety of the individual tested. (*Cf. Winston v. Lee* (1985), 470 U.S. 753, 84 L. Ed. 2d 662, 105 S. Ct. 1611 (denying, on fourth amendment grounds, prosecution's request for surgical removal of bullet fragment from defendant's body).) As an additional circumstance reducing the impact of the intrusion on individual privacy interests, we note that the test results may be disclosed only to the person tested, and to others, as directed by the trial judge, and otherwise must remain confidential. Thus, we conclude that the intrusion mandated by section 5—5—3(g) is comparatively slight.

We recognize that the information obtained as the result of a positive HIV test may have a devastating impact on individuals who would prefer not to know their true status. In addition, persons with AIDS are often stigmatized and subject to social disapproval. (See Comment, *When Rape Victims' Rights Meet Privacy Rights: Mandatory HIV Testing, Striking the Fourth Amendment Balance*, 67 Wash. L. Rev. 195, 208-09 (1992).) These matters are indications of the seriousness of the AIDS problem. We do not agree with the defendants, however, that these consequences make the test more

objectionable for fourth amendment purposes, for the focus of the fourth amendment inquiry must remain primarily on the actual physical intrusion caused by the search. (See Note, *AIDS and Rape: The Constitutional Dimensions of Mandatory Testing of Sex Offenders*, 76 Cornell L. Rev. 238, 256 (1990).) Moreover, the statute at issue here requires that the test results remain confidential; they are subject to disclosure only upon court order.

In addition, we note that offenders necessarily have reduced expectations of personal privacy. (See *Griffin v. Wisconsin* (1987), 483 U.S. 868, 97 L. Ed. 2d 709, 107 S. Ct. 3164 (probationer's home); *Hudson v. Palmer* (1984), 468 U.S. 517, 82 L. Ed. 2d 393, 104 S. Ct. 3194 (prisoner's cell); see also *Bell v. Wolfish* (1979), 441 U.S. 520, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (pretrial detainee's body cavities).) Under section 5—5—3(g), the testing requirement is triggered only upon a person's conviction for one of the offenses specified in the statute. Thus, the statute operates only at that point in the proceedings when a defendant no longer enjoys a presumption of innocence but instead stands at the threshold of incarceration, probation, or other significant curtailment of personal freedom.

Finally, we believe that the general requirement that a search be conducted only upon probable cause or some other showing of individualized suspicion would be impracticable here, for often there are no outward manifestations of the disease, or of a person's status as a carrier of HIV, apart from the individual's membership in a high-risk group. Thus, requiring individualized suspicion would only jeopardize the State's goal of accurately identifying HIV carriers among those members of the population who are primarily at risk of exposure to the virus.

The parties have devoted substantial portions of their briefs to a discussion of the accuracy of HIV tests and to

the relative merits and demerits of mandatory testing of at-risk population groups. Evidence of this nature was introduced at the hearing conducted in the circuit court, and additional information can be found in the extensive medical literature on AIDS. Although these matters are not irrelevant to our consideration of the statute's validity, we note that we are unable to grant to these "legislative" facts the same deference that is normally accorded to a trier of fact's resolution of a disputed question. See *Lockhart v. McCree* (1986), 476 U.S. 162, 168 n.3, 90 L. Ed. 2d 137, 145 n.3, 106 S. Ct. 1758, 1772 n.3, citing *Dunagin v. City of Oxford* (5th Cir. 1983), 718 F.2d 738, 748 n.8.

The central focus of the defendants' challenge to the HIV testing statute is their argument that mandatory testing, even of high-risk groups, is not an effective means of combating the spread of AIDS. The defendants observe that many eminent public health authorities have declared their opposition to mandatory HIV testing. The defendants contend that mandatory testing is ineffective because the test results are not always accurate, whether through the variable latency of the virus, which can elude detection even though it is present in the body of the person tested, or through limitations on the sensitivity and specificity of the tests themselves. The defendants make the related argument that a negative test result might give the offender and the victim a false sense of security, causing them to believe mistakenly that they have not already been exposed to the virus. In addition, the defendants surmise that mandatory testing might even be counterproductive, particularly when it is used with groups such as women in prostitution. For example, defense witness Colleen Ahler testified that persons subject to mandatory testing might resent the physical and psychological intrusions produced by the test and thus choose not to voluntarily cooperate

in further reducing the risk of spreading this disease. The defendants believe that voluntary testing and widespread public education are more effective measures of dealing with the AIDS problem.

Based on the evidence introduced in the circuit court, the defendants further assert that many of the sexual practices most frequently performed in prostitution do not involve activity having a high risk of HIV transmission. In addition, the defendants suggest that if a program of mandatory testing is going to be adopted, it should be limited to cases in which an offender has committed an act having some demonstrable risk of transmitting the disease. The defendants note that no sexual activity occurred in the present cases, and they conclude that their intended partners—undercover police officers—thus had no risk of exposure to the virus.

In a decision upholding the use of roadblocks to detect and apprehend impaired drivers, the Supreme Court rejected a similar contention that alternative measures would provide a more productive and less intrusive means of accomplishing that goal:

> "Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources ***." (*Michigan Department of State Police v. Sitz* (1990), 496 U.S. 444, 453-54, 110 L. Ed. 2d 412, 422, 110 S. Ct. 2481, 2487.)

Thus, the issue before us is not whether the State has chosen what all or even most experts would consider to be the best or most effective means of combating the disease, but whether the means chosen by the State can withstand constitutional scrutiny. See also *Skinner v. Railway Labor Executives' Association* (1989), 489 U.S.

602, 629 n.9, 103 L. Ed. 2d 639, 667 n.9, 109 S. Ct. 1402, 1419 n.9; *National Treasury Employees Union v. Von Raab* (1989), 489 U.S. 656, 673-76, 103 L. Ed. 2d 685, 707-09, 109 S. Ct. 1384, 1394-96.

It is clear that unprotected sexual activity is a major means of transmitting AIDS. According to testimony presented in the court below, women in prostitution have on average 20 sexual encounters each week. Whether or not the statutory scheme provides the most effective means of dealing with the AIDS problem, we do not believe that its program of mandatory testing of certain groups of offenders is constitutionally infirm. In sum, the challenged statute serves a compelling State interest, one that we believe is a special governmental need rendering unnecessary the traditional fourth amendment safeguards of a warrant and individualized suspicion. The testing procedure is activated by court order, but the statute affords the presiding judge no discretion in determining who must be tested. Accordingly, there would be little purpose served by separately requiring the issuance of a warrant. The governmental interest at stake here, and the type of statute involved, similarly militate against imposing a requirement of individualized suspicion. The HIV testing statute serves a preventative purpose, and thus is designed to fulfill a function for which individualized suspicion is less appropriate. The test required by the statute represents only a minimal intrusion on the person tested, who by reason of his status as a convicted offender can claim only a diminished expectation of privacy. Revelation of the test results, however, is carefully limited; the results of the test are subject to disclosure only as ordered by the court and must otherwise remain confidential. Finally, requiring individualized suspicion would be impracticable, and would only thwart the achievement of this legitimate governmental purpose. For these reasons, then, we conclude

that the challenged statute is not an unreasonable search and seizure under the provisions of the United States and Illinois Constitutions.

## III

The trial judge also found that the HIV testing requirement violates the equal protection clause of the Federal Constitution (U.S. Const., amend. XIV). The trial judge believed that the distinction recognized by the statute was not rationally related to a legitimate governmental interest. The defendants press the same contention here, relying on the Federal guarantee and its Illinois counterpart (Ill. Const. 1970, art. I, §2).

As a preliminary matter, we reject the alternative contention, made by the defendants and certain *amici*, that the statute creates a sex-based classification because of its impact on female offenders, and that it must therefore survive strict scrutiny under the Illinois Constitution's prohibition of sex-based discrimination (Ill. Const. 1970, art. I, §18; see *People v. Ellis* (1974), 57 Ill. 2d 127, 132-33). The statute draws no distinction between male and female offenders, and the defendants point to no evidence of an intent by the legislature to disadvantage female offenders. Accordingly, the additional claim of disparate impact must be rejected. See *Washington v. Davis* (1976), 426 U.S. 229, 240-42, 48 L. Ed. 2d 597, 607-09, 96 S. Ct. 2040, 2047-49.

The defendants also argue that mandatory testing of certain groups of individuals is not an effective means of combating the spread of AIDS. To demonstrate that the testing statute will fail to achieve its avowed goal, or a legitimate governmental purpose, the defendants contend that the measure is both overinclusive and underinclusive in scope.

The defendants believe that the statute is overinclusive in scope because its includes within its scope of-

fenses having no risk of AIDS transmission. For example, a person convicted of directing someone to a place of prostitution, which could be solicitation (Ill. Rev. Stat. 1989, ch. 38, par. 11—15), is subject to the statute's requirement. The defendants maintain that the statute is underinclusive in scope because it fails to require HIV testing for certain criminal and noncriminal conduct that is as likely to result in the transmission of AIDS as prostitution, the offense charged here. For example, the defendants point out that the statute omits from its testing requirement certain other offenses involving sexual misconduct, such as adultery, fornication, public indecency, sexual relations within families, and bigamy (Ill. Rev. Stat. 1989, ch. 38, pars. 11—7, 11—8, 11—9, 11—11, 11—12). In addition, the defendants observe that persons who engage in promiscuous noncriminal sexual activity are not subject to testing under the statute. The defendants contend that the extent to which the challenged statute is alternately overinclusive and underinclusive demonstrates the absence of any legitimate governmental purpose that would sustain it.

Our consideration of the defendants' equal protection challenge is guided by certain well-established principles:

"The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.' *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415 (1920). But so too, '[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' *Tigner v. Texas,* 310 U.S. 141, 147 (1940). The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protec-

tion Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose." *Plyler v. Doe* (1982), 457 U.S. 202, 216, 72 L. Ed. 2d 786, 798-99, 102 S. Ct. 2382, 2394.

The present statute does not ,impinge upon the exercise of a fundamental right or operate against a suspect class. Thus, under the standard of review appropriate here, the statute need not establish a perfect fit between the desired end and the means chosen to achieve that end.

In deciding which offenses to include in the statutory requirement and which ones to omit, the legislature may have considered the costs and utility of testing and might therefore have declined to impose the testing requirement with respect to those offenses for which the perceived need or danger was least. The evidence indicates that sexual activity is one of the primary means by which HIV is transmitted from one person to another. It was then appropriate for the legislature to include prostitution among the criminal offenses for which testing would be required. Such a requirement bears a rational relationship to the State interest in combating the spread of AIDS.

In sum, we conclude that the testing provision, as applied to the present defendants, does not deny them equal protection of the laws, under either the Federal or State Constitutions.

## IV

As a final matter, we now consider various motions that were taken with the case. The defendants have moved to strike portions of the State's opening brief and reply brief on the ground that they include citations to and discussions of material not introduced at the evidentiary hearing in the circuit court. In support of their ini-

tial motion, the defendants submitted the affidavit of one of their expert witnesses, Dr. Renslow Sherer, challenging the accuracy of a number of assertions in the State's opening brief. In response, the State has moved to strike Dr. Sherer's affidavit. We believe that the governmental reports and professional studies cited in the parties' briefs are matters that may be considered by this court. (See *People v. Garrett* (1975), 62 Ill. 2d 151, 165. But see *People v. Kohrig* (1986), 113 Ill. 2d 384, 406 (allowing motion to strike certain safety statistics not originally presented in circuit court).) Accordingly, we deny the defendants' motions to strike portions of the State's opening and reply briefs.

For the reasons stated, we reverse the judgment of the circuit court and remand these consolidated causes for further proceedings.

*Reversed and remanded.*