JANE DOE, Plaintiff-Appellee, v. VIOLETTA BURGOS, Defendant (The Department of Corrections, Defendant-Appellant).

Fourth District    No. 4—93—0576

Argued May 18, 1994.—Opinion filed August 5, 1994.

LUND, J., specially concurring.
STEIGMANN, J., dissenting.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and William K. Blanchard, Assistant Attorney General (argued), of counsel), for appellant.

Richard J. Black (argued), of Black & Black, of Morris, for appellee.

JUSTICE COOK delivered the opinion of the court:

Jane Doe, a correctional officer, filed a complaint seeking that Violetta Burgos, an inmate at Dwight Correctional Center, undergo a human immunodeficiency virus (HIV) antibodies test; that the Illinois Department of Corrections (IDOC) be forced to take whatever steps necessary to see that Burgos is tested; and that the test results be disclosed to Doe. The trial court granted Doe's requested relief. IDOC appeals. Burgos does not appeal. We affirm.

Doe filed her complaint against Burgos and IDOC on February 3, 1993. Doe sought the aforementioned relief based on section 7(c) of the AIDS Confidentiality Act (Act) (Ill. Rev. Stat. 1989, ch. 111½, par. 7307(c)). Burgos, in her answer, stated she had been voluntarily tested on January 28, 1993, and attached the test results.

In March 1993, Doe filed a motion for summary judgment. IDOC filed a cross-motion for summary judgment asserting Doe had received all her requested relief so the issue was moot. IDOC also asserted that the cause was barred by sovereign immunity. The trial court in April 1993 denied both motions for summary judgment but, finding that time was of the essence, entered an order requiring that

within 30 days IDOC furnish Doe with detailed information of the testing of Burgos or, in the alternative, force Burgos to undergo a second test as per the Act. The trial court gave Doe 30 days to respond whether the testing procedures, whichever alternative was chosen, were acceptable.

IDOC chose not to retest Burgos, but did provide detailed information of the first test. Doe then filed affidavits alleging the first test was inadequate, a motion that a new test be performed, and a motion for attorney fees. After a hearing, the trial court entered its order on July 1, 1993, finding the first test inadequate. The court directed IDOC to draw blood from inmate Burgos in a medically and scientifically acceptable manner and transport it in a medically and scientifically acceptable manner to a lab chosen by Doe. The blood was to be drawn in Doe's presence, and the test results were to be disclosed to the parties "and to no others." The court reserved ruling on the motion for attorney fees, but found there was no just reason to delay appeal. IDOC then filed this appeal and a motion for stay pending appeal, which was granted by this court.

Doe has been a correctional officer at Dwight Correctional Center for 13 years. On February 19, 1989, she was attempting to control a disturbance when she was bitten twice by Burgos; the bites broke the skin and lasted about two minutes. Doe claims she made several requests that Burgos be tested; IDOC denies she made any requests until it was contacted by her lawyer in 1992. Although IDOC concluded it had no obligation to test Burgos, it succeeded in having Burgos voluntarily tested approximately five days prior to Doe's filing of her claim. Those test results were negative. Doe herself tested negative for HIV antibodies during the $3^1/_2$ years prior to the filing of her claim.

●1 IDOC first contends the trial court erred on its cross-motion for summary judgment because the doctrine of sovereign immunity applies to bar Doe's cause of action in the circuit court. Doe maintains the doctrine does not apply because the relief sought is against Burgos and not against IDOC.

Sovereign immunity was abolished in Illinois "[e]xcept as the General Assembly may provide by law." (Ill. Const. 1970, art. XIII, § 4.) The General Assembly, however, reasserted the State's sovereign immunity, expressly providing "the State of Illinois shall not be made a defendant or party in any court" except as provided in the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1991, ch. 48, par. 1601 *et seq.*) or the Court of Claims Act (Ill. Rev. Stat. 1991, ch. 37, par. 439.1 *et seq.*). (Ill. Rev. Stat. 1991, ch. 127, par. 801.) When sovereign immunity applies, the circuit court is without jurisdiction

to entertain the claim. See *Healy v. Vaupel* (1990), 133 Ill. 2d 295, 307-17, 549 N.E.2d 1240, 1246-51.

The sovereign immunity of the State has been extended to actions in which a State department or agency is named as a party defendant. (*Smith v. Jones* (1986), 113 Ill. 2d 126, 132, 497 N.E.2d 738, 740; *Noorman v. Department of Public Works & Buildings* (1937), 366 Ill. 216, 219, 8 N.E.2d 637, 638; *Schwing v. Miles* (1937), 367 Ill. 436, 441, 11 N.E.2d 944, 947.) The supreme court has stated "[a] department of State government is commonly known as a part, or division, of the government" and as such is granted sovereign immunity. (*Noorman*, 366 Ill. at 220, 8 N.E.2d at 638.) Whether an action is in fact one against the State, and hence one that must be brought in the Court of Claims, depends not on the formal identification of the parties but rather on the issues involved and the relief sought. *Healy*, 133 Ill. 2d at 308, 549 N.E.2d at 1247 (claimed negligence against State employees).

IDOC is not directly or adversely affected here because the cause of action, in substance, is against Burgos rather than IDOC. IDOC is an incidental party, only included in the cause of action because Burgos is in its custody. Although IDOC contends it is directly and adversely affected because the trial court ordered it to test Burgos, and presumably pay the related costs, this case is no different from many others where IDOC is required to produce an inmate and must incidentally pay related expenses, for example, producing an inmate in a civil case under a writ of *habeas corpus* to testify. (735 ILCS 5/10—135 (West 1992); see *In re Marriage of Allison* (1984), 126 Ill. App. 3d 453, 461, 467 N.E.2d 310, 316.) We assume that IDOC would prefer to test Burgos itself, rather than produce her for testing at some independent facility outside prison walls. Under section 5—4—1 of the Unified Code of Corrections (730 ILCS 5/5—4—1 (West 1992)), a person convicted of a sexual offense (who will likely be in the custody of IDOC) shall be required to submit specimens of blood to the Illinois Department of State Police. Section 12—18(e) of the Criminal Code of 1961 allows the court to order an HIV test after a finding of probable cause on a sexual assault charge. (720 ILCS 5/12—18(e) (West 1992).) There is no indication that sovereign immunity allows IDOC to prevent testing in these cases. The trial court did not err by refusing to apply the doctrine of sovereign immunity and allowing this cause of action to stand with IDOC as a named party.

●2 IDOC next contends the trial court erred in granting Doe her requested relief because the Act was not effective at the time of the bite and in any event the Act does not *require* IDOC to test Burgos. The trial court's ruling, however, was not based entirely on the Act:

"Illinois Department of Corrections, is hereby ordered to perform an additional HIV test on Inmate Violetta Burgos. And at least not sticking to the position that the Department's argument is incorrect as to whether or not they have a statutory duty. I am simply ordering that it be done under the authority of the court. And using that authority to convince Inmate Burgos that a judge ordered that this be done regardless of the statute."

In adopting the Act, the legislature found that "[t]he public health will be served by facilitating informed, voluntary and confidential use of tests designed to reveal HIV infection." (410 ILCS 305/2(3) (West 1992).) A reading of the Act indicates a purpose to protect individuals against the casual testing of their blood for the presence of the AIDS virus. For the most part, the Act does not address the drawing of blood. The Act's provision that "[n]o person may order an HIV test" without consent (410 ILCS 305/4 (West 1992)) seems to refer to doctors or lab technicians who might have blood in their possession, with the consent of the patient, and be tempted to run a test on it. The Act shows no purpose to restrict the courts, or the IDOC, from exercising whatever authority they may already have to draw blood from or order medical testing of inmates, without consent. Although the Act may not be an affirmative grant to the IDOC of authority to test inmates, we have no doubt that IDOC possesses broad power to perform medical testing on inmates for any medical conditions, including the presence of HIV antibodies, whenever it deems appropriate. The Act is not the exclusive source of IDOC's power to order testing. See *People v. Adams* (1992), 149 Ill. 2d 331, 339-48, 597 N.E.2d 574, 579-83; *Dunn v. White* (10th Cir. 1989), 880 F.2d 1188, 1194-97; *Johnetta J. v. Municipal Court* (1990), 218 Cal. App. 3d 1255, 1283-85, 267 Cal. Rptr. 666, 683-85; see generally 134 Ill. 2d R. 215.

The Act certainly is no shield for Burgos. Section 7(c) of the Act provides that consent "is not required for a health care provider or health facility to perform a test when a law enforcement officer is involved in the line of duty" with contact with the blood or bodily fluids of another. (410 ILCS 305/7(c) (West 1992).) The trial court had the authority to order Burgos tested for HIV antibodies.

●3 IDOC contends that its decision not to retest Burgos was reasonable. The medical director of IDOC testified that 95% of persons test positive for HIV antibodies within three months of transmission and at least 99% of persons test positive within six months of transmission. In the director's opinion, an HIV test should not be conducted on inmate Burgos because (1) Doe has tested negative, (2) if Burgos now tested positive that might indicate Burgos had

contracted the virus since the bites, (3) the potential for transmission of HIV infection through a bite is remote, and (4) Burgos did not seem to be at high risk for HIV infection. It is difficult to understand, however, why Doe should be forced to ignore even a small possibility that she might be at risk, especially in view of the fact that these blood tests are so routine and unobtrusive. (*Adams*, 149 Ill. 2d at 346-47, 597 N.E.2d at 582.) Although a positive test for Burgos will not conclusively establish that Doe is at risk, a negative test for Burgos will provide substantial reassurance for Doe.

There are concerns with some urine tests, and with blood tests in paternity cases, that a substitute donor may be used. Those concerns are not as great where blood is drawn from an IDOC inmate, but the concerns do at least exist. Even where the donor is clearly identified, there is concern that blood samples may be switched, especially in labs dealing with many such samples. IDOC was unable to present positive evidence that the blood tested here was that of Burgos. The trial court in this case did not enter summary judgment for Doe, but a judgment following a hearing where the parties were allowed to present evidence by affidavit. Although affidavits were submitted by IDOC contending the first HIV test was sufficient, an affidavit was also submitted by Doe's physician alleging the testing was not sufficient. The trial court was entitled to decide the weight to be given these affidavits. The trial court's order, which was essentially in accord with the affidavit submitted by Doe's physician, was not against the manifest weight of the evidence.

We recognize that "it is not the duty of courts to supervise the day-to-day operations of prison administration" (*In re Washington* (1976), 65 Ill. 2d 391, 399, 359 N.E.2d 133, 137), but we do not see that the trial court did so here. The trial court in this case was not acting on the complaint of an inmate, but on the complaint of an employee of the IDOC. Sovereign immunity would certainly not prevent the raising of this issue in a labor relations context. (Ill. Rev. Stat. 1991, ch. 127, par. 801.) This is not a case where a court attempts to direct what meals should be served, what hours should be kept, or even, as in *Washington*, the procedures for disciplinary isolation of juveniles.

For the foregoing reasons, the trial court's order is affirmed.

Affirmed.

JUSTICE LUND, specially concurring:

Doe, while performing her duties as a prison guard, was bitten by an inmate. The inmate's action must be termed wrongful and most likely illegal. Today, HIV and the resulting disease of AIDS are legit-

imate fears. The victim of one who might have the virus, injured in a way that might well transmit the virus, should have recourse to test results which either negates the fear or warns the victim to seek the best medical treatment possible.

Here, a test was made—and Doe questioned the testing process. The trial court found that a reasonable question arose concerning the testing procedure, and it ordered retesting. If a reasonable question exists as to the method of testing, is it unreasonable to order retesting? I, as well as the author of the majority opinion, find the order of retesting reasonable. We recognize that the trial court's decision regarding the first testing procedure should not be reversed unless against the manifest weight of the evidence.

As far as I am concerned, the trial court's order, and the majority of this decision of our court, would be the same whether the employer of the victim of wrongdoing was IDOC or any other governmental or nongovernmental entity. This case has nothing to do with the operation of a place of incarceration; it involves proper information to a victim of a wrongdoing.

IDOC is here because plaintiff (the victim) cannot require the blood testing of the wrongdoer without assistance of the IDOC. The trial court is not telling IDOC how to run its prisons—it is telling IDOC that the wrongdoer is to be tested with the use of a reasonable procedure. If the wrongdoer had not been incarcerated, the testing should still have been ordered.

The dissenter evidently believes IDOC has some special status which prevents any judicial interference. He appears to be saying that even if the trial court was justified in finding a question arose regarding the testing procedure, that court could not order the testing. If the trial judge's conclusion is correct, then I suggest IDOC could have refused to give the first test without fear of outside intervention. While I respect the necessity of IDOC's relatively unfettered control of its institutions, I will not concur in depriving the plaintiff employee of the relief ordered by the circuit court.

JUSTICE STEIGMANN, dissenting:

I strongly disagree with the majority's decision to affirm. In my view, the decision of the supreme court in *Washington* completely disposes of the circuit court's attempt in this case to tell IDOC how to govern its internal procedures. It is utterly beside the point that the circuit court here did not act on the complaint of an inmate, but instead on the complaint of an IDOC employee. The authority the circuit court purported to exercise in *Washington*—that the supreme court soundly rejected—was the circuit court's attempt to "intrude

upon traditional matters of internal institutional administration." (*Washington*, 65 Ill. 2d at 398, 359 N.E.2d at 137.) It makes no difference at whose request such an intrusion occurs.

In *Washington*, the juvenile division of the circuit court of Cook County entered an injunction against IDOC (based upon that court's interpretation of due process) which had the effect of interfering with departmental policies. The supreme court noted that if the circuit court were allowed to inject itself into IDOC operations in such a manner, it

"would open the door for the juvenile divisions of the courts in the various counties to determine what each believes are the required procedures for disciplining its wards. Such actions would create intolerable problems in administration for the Department, and this alone provides sufficient reason to [reverse the circuit court's order]." (*Washington*, 65 Ill. 2d at 399, 359 N.E.2d at 137.)

The supreme court then added the following:

"In *Meachum v. Fano* (1976), 427 U.S. 215, 49 L. Ed. 2d 451, 96 S. Ct. 2532, the United States Supreme Court repeatedly emphasized the point that it is not the duty of courts to supervise the day-to-day operations of prison administration. That court was obviously aware of the tremendous administrative problems which would result if courts were to intrude into the daily internal operations of prisons. The actions of the circuit court in the instant appeal are illustrative of that improper activity." *Washington*, 65 Ill. 2d at 399, 359 N.E.2d at 137.

IDOC employs thousands of people and has facilities of one sort or another in dozens of counties throughout this State. Assume that John Doe works at the Pontiac Correctional Center in Livingston County and lives in Grundy County, wherein an IDOC work camp is located. If the majority opinion is correct, nothing would stop John Doe from suing in Grundy County to ask *that* circuit court to direct IDOC to take certain steps at the Pontiac Correctional Center regarding HIV testing that it did not wish to take; or, for that matter, to take some other action (of whatever nature) that John Doe believes is necessary for his personal protection but that IDOC does not wish to take. Similarly, of course, nothing would stop another IDOC employee from suing IDOC in his or her own county—perhaps McLean or Woodford—concerning the same matter about which the Grundy County circuit court had ordered certain IDOC actions. It does not take great imagination to envision a situation in which IDOC is subjected to multiple, *conflicting* orders entered by the circuit court in different counties.

In *Washington*, the supreme court concluded by noting that "the juvenile division of the circuit court cannot under the guise of an

injunction attempt to establish procedures and guidelines for the Department of Corrections for which it has no authority under the Juvenile Court Act." (*Washington*, 65 Ill. 2d at 399, 359 N.E.2d at 137.) The supreme court could not be more clear about the inappropriateness of circuit courts' entering injunctions which establish procedures and guidelines for IDOC, yet clearly that is what the circuit court did in this case. It is no answer to say, as the majority seems to (265 Ill. App. 3d at 794), that the circuit court has not attempted to establish *a lot* of procedures and guidelines for IDOC. The point the supreme court in *Washington* was trying to make is that the 797 circuit judges in this State are not—and cannot be permitted to become—bureaucrats in robes, in the business of telling IDOC what to do with regard to its internal procedures.

Last, I notice that in *Washington*, the supreme court never even mentioned the phrase "sovereign immunity"; it did not need to. The circuit court's order was so intrusive—as it is in this case—that the supreme court simply rejected the circuit court's position as beyond that court's power and authority. Or, to be more blunt, the supreme court in *Washington* did not need to invoke sovereign immunity in order to relieve IDOC from the blatantly *ultra vires* order of the circuit court.

The majority opinion is wrong, its underlying policy is wrong, and I urge the supreme court to reverse it. If somehow the supreme court fails to do so, then this court would be responsible for opening the floodgates to voluminous litigation—with much of it inevitably frivolous—seeking to have circuit courts Statewide regulate all aspects of IDOC's internal procedures.

I respectfully dissent.