NOTICE
Decision filed 07/25/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240074-U

NO. 5-24-0074

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 20-CF-1552 |
| | ) | |
| CURTIS L. REED, | ) | Honorable |
| | ) | Jeffrey K. Watson, |
| Defendant-Appellee. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie* concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's order granting defendant's motion to suppress all evidence found within the residence is affirmed in part and vacated in part where the trial court's finding of an invalid protective sweep was error and items found in plain view during the sweep should not be suppressed; however, the trial court's order regarding the officers' search of defendant's vehicle is affirmed.

¶ 2    The State appeals the trial court's order granting defendant's motion to suppress evidence obtained during a protective sweep following the service of an arrest warrant. For the following reasons, we affirm in part and reverse in part.

---

*Justice Welch participated in oral argument. Justice Boie was later substituted on the panel and has read the briefs and listened to the recording of oral argument

1

¶ 3                                    I. BACKGROUND

¶ 4      On November 4, 2020, defendant, Curtis Reed, was arrested and charged with one count of unlawful possession with intent to deliver a controlled substance (greater than 15 and less than 100 grams) in violation of section 401(a)(2)(A) of the Illinois Controlled Substances Act. 720 ILCS 570/401(a)(2)(A) (West 2020). He was also charged with four counts of unlawful possession of a firearm by a felon in violation of section 24-1.1(a) of the Criminal Code of 2012. 720 ILCS 5/24-1.1(a) (West 2020). The firearm charges were related to: (1) a .45-caliber handgun SN: NIM19199; (2) a .40-caliber handgun SN: SCR69229; (3) a 9-millimeter Masterpiece Arms handgun SN: FX13557; and (4) a 9-millimeter Taurus handgun SN: AAM104205. The weapon charges were related back to a previous felony theft conviction in St. Clair County case No. 16-CF-1448. On November 13, 2020, the grand jury issued indictments on all five charges.

¶ 5      On April 7, 2022, defense counsel filed a motion to suppress, claiming the St. Clair County Sheriff's Department and Fugitive Task Force violated defendant's rights under the fourth and fourteenth amendment of the United States Constitution and sections 2 and 6 of article I of the Illinois Constitution. In support, defense counsel argued that (1) police detained defendant without cause, (2) searched him without cause or consent, and (3) searched his automobile and home without cause or consent. Defense counsel argued that all evidence obtained as a result of the unlawful search must be suppressed. The State did not file any responsive pleading.

¶ 6      A hearing on the motion was held on October 23, 2023. Testimony was provided by John Baudino, a special agent with the Illinois State Police who was assigned to the U.S. Marshals; Xavier Blackburn, a sergeant in the St. Clair County Sheriff's Department and U.S. Marshal; Aaron Hackleman, an investigator with the Drug Tactical Unit (DTU); defendant's fiancée Arricka

2

Hudson; Arricka's brother Breon Ratliff; and Marina Gayden, who was Arricka's mother and the owner of the house that was searched.

¶ 7    Officer Baudino testified that on November 4, 2020, Sergeant Blackburn had an arrest warrant for Brian K. Ratliff,[1] who lived on Julie Avenue in Cahokia, Illinois. Upon arrival, the task force unit established a perimeter around the residence. While Officer Baudino was at the back of the house, he heard members of the task force knocking on the front door, announcing their presence, and the front door opening. Officer Baudino stated that he could hear people moving around in the house and also heard officers enter the home and make announcements. After the announcements, subjects exited the front door, complying with the commands. Officer Baudino then received a call through his radio requesting additional officers to conduct a safety sweep of the residence. He stated that he did not expect the request because when he arrived at the house that day, he did not know officers were going to enter the house.

¶ 8    Officer Baudino testified that he returned his canine partner to the rear of his patrol car and ran up to the front door of the residence. He stated that there were several people standing outside with other task force members on the porch. He was told they were doing a safety sweep based on the fact that other people were moving around in the house. He could not recall if the people on the porch were handcuffed. Officer Baudino recognized one of the people on the porch as defendant, Curtis Reed, but was unsure of how many people were also on the porch. After reviewing his report, Officer Baudino confirmed there were five people on the porch and stated there was an indication that more people were inside based on movement in the house. He stated they were also looking for Kelan Washington, who was a known associate of defendant and Brian Ratliff, and they expected Washington to be there too. Officer Baudino agreed that no statement

[1]Brian Ratliff is the brother of Breon Ratliff and Arricka Hudson.

3

about Washington was included in his report. He stated that he independently remembered that fact because Washington, Brian Ratliff, and defendant were all subjects of other investigations, including a carjacking and shootings. He testified that he believed there were still dangerous people in the house because they "operate in a group or have appeared to operate in a group at previous times." He further testified that the "front of the residence had been shot up and had shooting markers all over the front of the house."

¶ 9    Officer Baudino explained that the deputies conducted a safety sweep using two teams with one assigned to the upstairs and the other team assigned downstairs. He stated that the teams were used to working with each other and when "the supervisor says somebody take upstairs we're taking downstairs, we know what to do. We've done it before." He stated that the task force participated in about 100 sweeps over the last three years. He did not know how many arrest warrants ended in a protective sweep but estimated that approximately 10 percent ended in protective sweeps. As to this matter, he stated the sweep was performed based on movement in the house despite announcements to come to the door, bullet holes in the residence, and another known violent person, *i.e.*, Washington, who could have been in the residence.

¶ 10    Officer Baudino stated the teams did not locate any other persons in the residence. However, in the lower-level, southwestern bedroom a clear plastic bag containing suspected crack cocaine and a clear plastic bag containing cannabis were seen on the nightstand. Officer Baudino stated that cannabis was also found under the mattress during the protective sweep. He clarified that the cannabis was found between the mattress and box spring, stating that "[s]ometimes people that are emaciated on drugs don't give you that bump in the mattress" and confirmed they also looked under the bed. In addition to the clear bag containing suspected crack cocaine, three

4

firearms were also found under the mattress. He stated there was also a metal pot with a spatula covered in crack on the dresser.

¶ 11     Officer Baudino agreed that he photographed and collected the items in the bedroom. He was later advised that rifle caliber rounds were also found on top of the armrest of a couch located in the southeastern lower level of the house. He stated that he also photographed and collected those items, and all the items collected were turned over to Investigator Hackleman.

¶ 12     Officer Baudino testified that he recognized Brian Ratliff and defendant, who were on the porch, from previous interactions. He stated they were in the residence for 30 to 40 minutes after the knock. Officer Baudino then asked defendant if he was the owner of the Dodge Charger outside the residence. Defendant responded by trying to change the subject and avoided looking at the vehicle. Officer Baudino then went to Sgt. Blackburn and told him that defendant was nervous about the car, and that Officer Baudino believed additional contraband might be in the vehicle based on defendant's behavior. Officer Baudino stated that Sgt. Blackburn asked defendant for consent to search the vehicle. Officer Baudino confirmed he did not hear Sgt. Blackburn request consent from defendant, there was no body-camera footage, and he did not know if Sgt. Blackburn obtained a written consent to search because he never saw the form. He stated that Sgt. Blackburn told him later that defendant consented to the search and directed Sgt. Blackburn to the key in defendant's pants pocket. Officer Baudino did not hear that conversation or see defendant direct Sgt. Blackburn to the keys.

¶ 13     After Sgt. Blackburn handed over the keys, the Dodge Charger was unlocked. Officer Baudino did not know who unlocked the car but confirmed it was not him. He stated that another gun was seen through the window of the car in plain view between the driver's seat and the console. He then opened the car door and photographed the interior of the car. Officer Baudino confirmed

5

that at no point did anybody stop and get a warrant to search the car. He further agreed there was no warrant to search the house or car prior to initiation of the arrest warrant.

¶ 14    Officer Baudino stated that defendant and Brian Ratliff were handcuffed on the porch, but he did not know if anyone else was handcuffed. Officer Baudino confirmed that in addition to the firearm, three clear plastic bags containing suspected crack cocaine were located in the center console and a digital scale was located on the front driver's seat floorboard of the car. He clarified that the scale was in plain sight only if you were in a position to look under the seat and that it could not have been seen from outside the vehicle. He stated that all the items found in the car were also given to Investigator Hackleman. Officer Baudino confirmed that he opened the console and found the bags of crack cocaine.

¶ 15    On cross-examination, Officer Baudino explained that he worked with the Illinois State Police and Cahokia Police Departments prior to working for the U.S. Marshals. He stated that he was familiar with defendant due to his prior employment, noting that his duties at the Cahokia Police Department included keeping track of persons of interest in the Cahokia and East St. Louis area. Defendant's group was called "KG" and consisted of both Ratliff brothers, defendant, and Kelan Washington. He stated they produced rap music videos published on YouTube, and in the rap videos, there were all holding firearms. He stated the group members were also suspects in multiple carjackings and shootings. He further confirmed that Washington had been shot several times since his Cahokia employment and also carjacked a vehicle in St. Louis in front of the U.S. Attorney's office. While he was familiar with defendant, Officer Baudino was not familiar with defendant's home prior to serving the arrest warrant. He identified photographs taken at the residence labeled as State's Exhibits 1-11 and stated that when he entered the room where the drugs and weapons were found, there was a baby's crib and a dresser in the same room.

¶ 16   Officer Baudino testified that when they performed the protective sweep, there were unattended children in the house. He confirmed that he was familiar of the possible consequences of children being exposed to crack cocaine and believed it was important to find where the drugs were located and therefore stated the search "constituted an emergency."

¶ 17   On redirect, Officer Baudino confirmed that he knew Washington was associated with drugs and guns at the time they were executing the arrest warrant. He expected Washington would be where defendant and the Ratliff brothers were located. He further agreed that no one thought to get a search warrant before executing the arrest warrant at the residence. Officer Baudino's report was admitted into evidence and the photographs were admitted over defendant's objection.

¶ 18   Sergeant Xavier Blackburn testified that he sent a group text message to the task force the night before the execution of the arrest warrant. It advised of a brief meeting the following morning that would include the U.S. Marshal Services, members of the Great Lakes Task Force, the DTU, the Illinois State Police, the Bureau of Alcohol, Tobacco and Firearms, and St. Clair County Sheriff's Department. The text message advised that Sgt. Blackburn had an active warrant for Brian Ratliff and there would be a meeting the next morning to discuss execution of the warrant. At the meeting the following morning, Officer Baudino advised the members of Brian Ratliff's association with defendant and the KG Boys gang. He stated that on the day of Brian Ratliff's arrest, they knocked on the door, announced their presence, someone answered the door, and they explained they were there to arrest Brian Ratliff for armed robbery. He explained that DTU came along if the investigation involved drugs or guns and stated that DTU was not there when they served the arrest warrant on Brian. He confirmed that Investigator Hackleman was not at the location when the arrest warrant was served, stating that DTU was called in later.

7

¶ 19    Sgt. Blackburn stated that after the knock and announce, while waiting at the front door, he remembered seeing a male open a curtain window and quickly close it. He did not see who it was. The door was later opened by Arricka Hudson, who indicated that Brian was in the house along with several other individuals and small children. Sgt. Blackburn stated that they spoke at the threshold and Arrika was escorted outside. The officers entered the house. Brian appeared from an upstairs bedroom and began walking down the stairs to the officers. He was also escorted out of the house. A female, Zioreyah Moten, appeared at the top of the stairs from the same bedroom as Brian. Defendant appeared from the downstairs bedroom. They were also escorted outside. Arricka advised Sgt. Blackburn that there were several small children still inside the residence and Sgt. Blackburn began conducting a protective sweep checking for any other individuals including the small children. He stated he believed the only people inside were the small children but "when you execute a warrant you don't know, there's possibly individuals that *** people might not disclose, not mention, might not even know." He agreed that he did not articulate in his report the name of any other individual that might be in the house. He stated they were just looking for people during the protective sweep. Sgt. Blackburn stated that he knew there would be bullet holes in the front of the house because there was an alleged drive-by shooting that occurred a night or two earlier at the residence. He stated he did not know if the house was associated with drugs or guns.

¶ 20    Sgt. Blackburn stated that they always did a protective sweep when serving warrants because it was part of their protocol. He said there were four children in the house who were aged 1 month old, 7 months old, 2 years old and 10 years old. He said they were taken outside and turned over to Arricka, who was not handcuffed. Sgt. Blackburn stated that his portion of the sweep was upstairs. He knocked on a closed door upstairs, announced police presence, demanded entry, and received no response. Once he was inside the room, he found a bedroom and a bathroom but

8

no other individuals. He confirmed that the plain view cannabis was found in defendant's room downstairs.

¶ 21   Sgt. Blackburn testified that the homeowner was identified as Arricka's mother, Marina Gayden. He said that once the cannabis was found, DTU was notified. DTU responded and conducted their investigation. Sgt. Blackburn did not know if DTU obtained consent from Arricka. He did not recall taking Arricka to the kitchen or requesting her consent to search. He said that after DTU responded, Marina Gayden arrived. He spoke to Marina, but DTU handled the consent and the formalities. He agreed that he served as a witness to Marina's signature on the consent to search form. He disputed that Marina was threatened regarding continued ownership or residing in the residence.

¶ 22   Sgt. Blackburn stated that he did not speak with defendant about getting his consent either but was present when the consent was obtained. He believed that the Illinois State Police handled that part of the investigation and, after reviewing his report, Sgt. Blackburn confirmed that it stated consent was provided to Officer Baudino. Sgt. Blackburn stated that he did not hear defendant provide his consent to search the Dodge Charger to Officer Baudino but agreed the gun was in plain view through the window.

¶ 23   On cross-examination, Sgt. Blackburn agreed that exercising a warrant on a fugitive-at-large was an inherently dangerous circumstance. He stated that he preferred to err on the side of caution and have too many officers than too few. He further stated that protective sweeps were necessary in multi-room houses.

¶ 24   Investigator Aaron Hackleman testified that he was an investigator with DTU and confirmed that he was advised by text message of the plan to serve the arrest warrant on Brian Ratliff the following day. He disputed that DTU was called in later and explained that DTU's job

was to process drugs, if any were found at the house. He stated that he knew of the history of the residence and that there was a possibility of narcotic sales and gun activity. He stated that he drove to the location and hung back, confirming he was the only individual available from DTU that day, which usually had four or five people. He agreed that no search warrant was obtained beforehand, and no one suggested it at the morning meeting. He stated that safety protocols for a protective sweep were discussed at the morning meeting, and it was clear a protective sweep would be made because that was U.S. Marshal standard operating procedure. He remained at the property perimeter because that was as far as he would go unless they needed him.

¶ 25    Investigator Hackleman eventually processed the scene and received evidence from the U.S. Marshals. He spoke with Arricka and defendant. He did not witness either of them signing consent to search forms. He agreed that he drafted a summary of defendant's interview that included a statement that defendant consented to the search. He said that after the consent question, defendant invoked his right to remain silent, and the interview was immediately terminated. Investigator Hackleman stated that he also tried to interview Breon Ratliff, but that request was denied because Breon was a minor and his mother said he did not want to talk. He stated that Marina Gayden did not give any statement.

¶ 26    Defense counsel questioned the veracity of Investigator Hackleman's statement about defendant's consent during the interview despite playing that portion of the interview at the hearing. Investigator Hackleman stated that defendant gave consent to Sgt. Blackburn at the residence and that defendant gave consent "by omission" during the interview. The interview and Investigator Hackleman's report were placed into evidence.

¶ 27    Breon Ratliff testified that he was upstairs the day the arrest warrant for his brother was served. He heard banging on the door and saw the officers. He stated that both his sister Arricka

and his brother Brian were outside the house before he was. He stated that he was placed in handcuffs but did not resist or argue. He stated that he stood outside in handcuffs for about an hour while the officers searched the house. He agreed that he was not questioned because his mother did not give consent.

¶ 28    Arricka testified that she heard banging on the door and went upstairs to answer the door, explaining that it was a split-level house. She said that Brian was behind her when she headed to the door. She asked who was at the door, and the police identified themselves and said why they were there. She went outside and Brian followed her. She stated that the "black officer," later identified as Sgt. Blackburn, immediately came into the house. She told him that Brian was with her, but the officers proceeded to go in and search the house. She stated that Brian was handcuffed but she was not, and they stood outside for about an hour. She was never shown a search warrant and was never offered a consent to search form. She testified that Sgt. Blackburn told her they found a lot of stuff in the house and asked for her consent, but she told him she was not the homeowner. She tried to call her mother and a lawyer for Brian, but Sgt. Blackburn took her phone and told her he was going to place her under arrest. She was able to call the lawyer but then the phones were confiscated. She was then handcuffed. Thereafter, Arricka, defendant, and Brian Ratliff were placed in the police vehicle together. She believed that she was handcuffed and escorted outside because she would not agree to give retroactive consent. She did not hear defendant provide consent to search his car. She saw the officers go through defendant's pocket and find a key, but that key did not work so the officers went into the house and found another key fob to see what car would unlock.

¶ 29    Arricka stated that she, Brian, and defendant were handcuffed in the police car when defendant's car was searched. Her car was parked in front of defendant's car, officers never asked

11

for her consent to search her car, and her car was never searched. She stated that her mother eventually arrived, and the officers tried to get consent from her mother. Arricka explained that Brian and Breon were her bothers and defendant was her fiancé. She was unaware of Brian Ratliff's fugitive status or that 38 grams of crack cocaine were in the house. She stated she was unaware that there were metal pots and spatulas covered in crack cocaine residue in plain sight at the house. She did not know about the three guns in the house because she never saw them.

¶ 30    Marina Gayden testified that she was at work when the arrest warrant was served. She stated that she received a text from Arricka telling her she needed to come home because the police were at the house. She arrived at the house between 7:30 and 8 a.m. Her son and defendant were outside along with Arricka and Arricka's children. She said her daughter was not in handcuffs and neither were the children. She said the only ones with handcuffs were Brian, Breon, and defendant.

¶ 31    Marina said she went into the house and was directed to the kitchen. She saw that her bedroom door was broken down and stuff was tossed all around the downstairs of the house. She said that the officer threatened to "hold her home up for years" if she did not sign the consent. It seemed to her that he was threatening her house if she did not sign the consent. She did not remember his exact words. She stated that she was renting-to-own the home and was about four or five years into the contract and expected to own the house in the next four years. She said she spoke with the African American officer (identified as Sgt. Blackburn) and cooperated with law enforcement because she did not want to lose her home. That was why she signed the consent. She said the conversation lasted about 20 minutes because the officer had to convince her to sign the document. On cross-examination, Marina admitted that defendant was her future son-in-law, and she had an interest in his well-being. Following the hearing, the court asked the parties to submit briefs on the issues and took the matter under advisement.

12

¶ 32 Defendant's brief was filed on November 7, 2023, and, after addressing the standard enunciated in *Maryland v. Buie*, 494 U.S. 325 (1990), argued that because no officer articulated a single fact that indicated a dangerous third party remained in the house, the second prong of *Buie* applied and was not met. The brief further argued why the first prong of *Buie* did not apply, relying on *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009), stating that *Archibald* ultimately held that a protective sweep was found unjustified when the defendant was coming toward the front door from inside the house and was arrested on the porch. Defendant asked that, at the very least, all the items found under the mattress be suppressed and the charges dropped.

¶ 33 The State's brief relayed additional facts that included defendant stating during the interview that he was hiding in a closet to the left of the stairwell until the police called him out of the residence. The State argued that defendant was asked to provide consent to search his vehicle and acquiesced in the consent and shrugged off the question during the interview. The State argued that protective sweeps were allowed under certain circumstances such as "when search officer possesses reasonable belief based on specific and articulable facts that the area to be swept harbors individual posing danger to those on arrest scene" based on *Buie*. While acknowledging that unknown persons yet to be known as assailants were insufficient, the State relied on Sgt. Baudino's testimony about his concern that Kelan Washington was there due to the group's gang activity. It argued that under *United States v. Tapia*, 610 F.3d 505, 508 (7th Cir. 2010), *United States v. Richards*, 937 F.2d 1287, 1291 (7th Cir. 1991), and *United States v. Winston*, 444 F.3d 115, 120 (1st Cir. 2006) (citing *United States v. Sokolow*, 490 U.S. 1, 11 (1989)), the officer's knowledge of gang activity was sufficient for a protective sweep, noting that confined areas of unknown configuration were more feared than open familiar surroundings. It further stated that defendant's reliance on *Archibald* was without merit because the *Archibald* defendant was home alone.

13

¶ 34    The State further argued that the emergency exception applied, stating that four children in the home created exigent circumstances, noting that a child's crib was in the same bedroom where defendant resided. The State argued that a bag containing crack cocaine was in plain sight, along with cookware on the dresser with crack cocaine residue, and more crack cocaine and firearms were found under the mattress in that room. The State also relied on Marina's consent to search and claimed that her signature undermined any claim of duress or coercion which was only mentioned for the first time at the hearing to suppress the evidence collected against her son-in-law. It further argued, citing 725 ILCS 150/2, that even if the police informed Marina of the possible issues with her home, the statements were correct.

¶ 35    As to defendant's vehicle, the State argued that the vehicle was within the curtilage area of the home and the weapon was in plain sight. It argued that an improperly stored firearm in plain sight located in a convicted felon's vehicle in conjunction with the execution of an arrest warrant, and the discovery of significant amounts of crack cocaine and firearms satisfied the requirements of *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011). The State argued that the vehicle was parked in a driveway attached to a public road and no effort was made to block the ability to view the weapon through the car window. The State also presented a public policy argument that finding the search invalid had a chilling effect on law enforcement's willingness to execute arrest warrants which only benefitted fugitives.

¶ 36    On December 15, 2023, the trial court issued an order addressing (1) whether officers had consent to search the house; (2) the scope and degree of the protective sweep of the home after arrest; and (3) whether the plain-sight doctrine was applicable to defendant's vehicle located on private property. Its findings related to the issues included that (1) the children were turned over to Arricka within minutes without incident; (2) the warrantless safety sweep lasted 40 minutes to

14

an hour, and included kicking in an interior door causing damage, overturning mattresses, and extensively searching every room at the location; (3) the Dodge Charger was parked on the premises and not a public street; and (4) the consent to search was signed by Marina after the warrantless safety sweep was conducted.

¶ 37    The trial court further found that the consent to search signed by Marina was involuntary. In support, the court noted that three people were handcuffed when Marina returned, her belongings were strewn all over the home, and her bedroom door was broken. It further noted that it took 20 minutes before she signed the consent, there was implied coercion about losing her home, and conflicting testimony by the officers about who obtained Marina's signature for the consent. It also noted that Investigator Hackleman of DTU said he was not present for the signature and Sgt. Blackburn denied talking to Marina about the consent, stating that DTU handled the consent despite his signature being on the witness line.

¶ 38    The court next considered whether the officers had articulable facts to support an extensive, warrantless protective sweep of the residence, noting the parties agreed that only the third relevant exception in Illinois, *i.e.*, a protective sweep, applied. It quoted *Maryland v. Buie*, 494 U.S. 325, 327 (1990), for the definition of a protective sweep and found the protective sweep in the instant matter was unlawful based on the following facts: (1) the predetermined nature of the protective sweep, noting that Sgt. Blackburn said they were always done which established no articulable facts existed at the scene requiring a protective sweep; (2) all the adult occupants of the residence presented themselves almost immediately upon Arricka answering the door, none were armed, and all cooperated when officers escorted them outside; (3) Sgt. Blackburn testified that once the adults exited the premises, he believed the only people left in the home were small children previously mentioned by Arricka and they were returned to her within minutes of the knock and announce;

(4) Sgt. Blackburn could not articulate the name of someone believed to be dangerous inside the home when asked directly and Officer Baudino articulated Kelan Washington as a potentially dangerous person at the hearing, but that testimony was undermined by Officer Baudino's admission that he neglected to put this "important information" in his report; (5) Sgt. Blackburn admitted he did not possess advance knowledge of guns or drugs associated with the residence; (6) Officer Baudino's testimony indicated the safety sweep did not locate any further persons inside the residence; and (7) the extensive nature and duration of the protective sweep involving two teams searching upstairs and downstairs simultaneously for nearly an hour, taking photos, kicking in doors, causing damage, and flipping mattresses which was far from the quick and limited search, incident to the arrest or cursory visual inspection, contemplated by *Buie*.

¶ 39    The court then addressed the search of defendant's vehicle and noted defendant was not the subject of the arrest warrant and his car was parked on private property. It found the officer's testimony conflicted on defendant's alleged verbal consent with the only two officers believed to have received consent disputing that defendant provided it to them. It also found the videotaped interrogation failed to support the claim in Investigator Hackleman's report that defendant agreed that he consented to searching his vehicle. The court also addressed the State's curtilage argument, stating that *Collins v. Virginia*, 584 U.S. 586 (2018), undermined the State's argument because there was no warrant, and the State failed to demonstrate that search of defendant's vehicle was consensual or exigent circumstances existed that allowed for the search of defendant's vehicle without a warrant. The State appeals.

¶ 40                                    II. ANALYSIS

¶ 41    Unreasonable searches and seizures are prohibited by the fourth amendment of the U.S. Constitution and article I, section 6 of the Illinois Constitution. U.S. Const., amend. IV; Ill. Const.

16

1970, art. I, § 6. A warrantless search is *per se* unreasonable unless it falls within one of the recognized exceptions. *People v. Harrell*, 226 Ill. App. 3d 866, 871-72 (1992) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). "In Illinois, those few exceptions are (1) a search based on consent, (2) a search incident to arrest, and (3) a search predicated upon probable cause where there are exigent circumstances which make it impractical to obtain a warrant." *Id.* at 872 (citing *People v. Gardner*, 121 Ill. App. 3d 464, 468 (1984)).

¶ 42 In the case at bar, the State argues that the trial court's order granting defendant's motion to suppress was erroneous. With regard to the house, the State claims that the search was authorized pursuant to the protective sweep, the sweep was justified due to the emergency exception to the warrant requirements of the fourth amendment, some of the evidence obtained during the sweep was in plain view, and the emergency exception allowed the officers to conduct a more thorough search. It further argues that the trial court's finding that the consent to search was involuntary was erroneous. Finally, the State also argues that the trial court's suppression of the evidence obtained from defendant's vehicle was also in error.

¶ 43 Our standard of review for suppression motion rulings provides deference to the trial court's factual findings and considers the trial court's ultimate ruling on the motion *de novo*. *People v. Hagestedt*, 2025 IL 130286, ¶ 14. Our deference to the trial court's factual findings "is grounded in the reality that the trial court is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony." *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001) (citing *People v. Gonzalez*, 184 Ill. 2d 402, 412 (1998)). The trial court's factual findings include whether the consent was voluntary because that involved credibility determinations and the test for voluntariness required a showing "from the totality of the circumstances that the consent was not the result of duress or coercion,

17

express or implied, but was, in fact, freely given." *Harrell*, 226 Ill. App. 3d at 872 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973)). The trial court's factual findings will only be reversed if they are against the manifest weight of the evidence. *Hagestedt*, 2025 IL 130286, ¶ 4 (citing *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006)). " 'Manifest error' means error that is 'clearly evident, plain, and indisputable.' " *People v. Banta*, 2021 IL App (4th) 180761, ¶ 25 (quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)).

¶ 44    "[C]ourts are precluded from admitting evidence that is gathered by government officers in violation of the fourth amendment." *People v. Lampitok*, 207 Ill. 2d 231, 241 (2003) (citing *Mapp v. Ohio*, 367 U.S. 643, 649 (1961)). "Law enforcement officers are not entitled to enter, much less search, a person's home without a warrant absent exigent circumstances." *Id.* at 243 (citing *Payton v. New York*, 445 U.S. 573, 590 (1980)). Typically, "the fourth amendment requires the government to obtain a warrant supported by probable cause before conducting a search." *Id.* (citing *Illinois v. McArthur*, 531 U.S. 326, 330 (2001); *People v. Adams*, 149 Ill. 2d 331, 341 (1992)). However, exceptions to the warrant requirement exist, one of which allows for "a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances." *Maryland v. Buie*, 494 U.S. 325, 335 (1990). This is not a full search of the premises and is merely a "cursory inspection of those spaces where a person may be found." *Id.* "The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36.

¶ 45    Here, the State claims that two of the trial court's findings were against the manifest weight of the evidence. The first involved the court's finding that the officers "conducted an extensive, warrantless safety sweep *** lasting approximately 40 minutes to an hour in which firearms and illicit drugs were recovered." The second finding to which the State contends error is that the

18

"warrantless safety sweep included kicking in an interior door causing damage, overturning mattresses, and extensively searching every room" at the residence.

¶ 46    As to the first finding, the State argues that the length of the safety sweep was not supported by any testimony. It contends that a short sweep was originally undertaken after the officers were advised that children were in the residence and after that "sweep revealed drugs in plain view *** officers continued with a more thorough search of the residence prior to allowing the individuals and children back inside." We note however, that such claim is not supported by the evidence. Officer Baudino did not testify that two sweeps were performed. After testifying that he was surprised a sweep was being performed, he stated that everyone knew their jobs and two teams headed into the house. His team searched the downstairs, and he saw drugs sitting next to the bed in defendant's room. He then testified that he looked in between the mattress in case an emaciated person was hidden there and found the weapons and a larger stash of drugs. As the officer that found the drugs indicated that the drugs were found during one sweep of the downstairs, that included lifting up mattresses, the State's argument of two searches has little persuasiveness.

¶ 47    Sgt. Blackburn's testimony was similar to that of Officer Baudino in only one sweep being performed. He testified that Arricka came to the threshold of the door and told the officers that Breon Ratliff, and other people, including children, were still inside. Sgt. Blackburn's testimony revealed that Breon Ratliff, Zioreyah Moten, and defendant then voluntarily came toward the front door of the house and were escorted out of the house. Sgt. Blackburn then stated that they began the sweep, checking for any other individuals including the small children, during which time Sgt. Blackburn knocked on a closed door upstairs, announced police presence, demanded entry, and received no response. Once inside, he found a bedroom and a bathroom but no other individuals. Nothing in Sgt. Blackburn's testimony stated, or even inferred, that two sweeps were performed.

19

Accordingly, we find no merit to the State's argument that the trial court's finding of a 40-minute to one-hour search of the premises in the guise of a protective sweep and, therefore, we cannot hold that the finding was against the manifest weight of the evidence.

¶ 48     The State's argument regarding the second finding is equally untenable. Here, the State claims that the court's findings that the "warrantless safety sweep included kicking in an interior door causing damage, overturning mattresses, and extensively searching every room" at the residence was in error. However, Officer Baudino and Sgt. Blackburn's testimony confirms the trial court's finding and, therefore, we again hold that the finding is not against the manifest weight of the evidence.

¶ 49     The State next argues that the court's holding that the sweep was unlawful because the State failed to demonstrate that the officers had articulable facts that the sweep was necessary to protect the safety of those at the arrest scene was erroneous. As noted above, we consider the trial court's holding *de novo*. *People v. Almond*, 2015 IL 113817, ¶ 55.

¶ 50     In support, the State argues that the totality of the circumstances established articulable facts necessitating the protective sweep as required by *Maryland v. Buie*, 494 U.S. 325, 327 (1990). In *Buie*, the Court defined a protective sweep to check for other dangerous persons if an "officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337. The Illinois Supreme Court has also recognized the permissibility of a protective sweep "even though the arrest itself was achieved without entry" as long as exigent circumstances existed for the sweep. (Internal quotation marks omitted.) *People v. Free*, 94 Ill. 2d 378, 396-97 (1983).

¶ 51     In support of its argument, the State points to the testimony provided about information discussed at the morning briefing prior to the execution of the arrest warrant. We agree with the

State. Here, it was undisputed that information regarding other possible people in the home was discussed at the morning meeting. While Officer Baudino was the only person who testified to a belief that Washington might be in the home at the time of the arrest, both Officer Baudino and Sgt. Blackburn were aware of gang affiliation between Washington, defendant, and the Ratliff brothers in the KG Boys, the members' past criminal activity, the fact that the residence was in a high crime area and was subjected to a drive-by shooting two nights earlier. Notably, while Washington was not found in the residence, defendant and both Ratliff brothers were residing in the home and the front of the house was riddled with bullet holes dispelling any possibility that the officers' concerns were invalid or their information was unreliable.

¶ 52    We agree that the trial court's notation of the conflicting testimony regarding the likelihood of a protective sweep is concerning as a possible "protocol" for U.S. Marshals. However, we do not find the conflict relevant when considered with the testimony of the officers. Each officer testified about his personal knowledge of the known character, criminal history, and gang affiliation of the potential residents in the home. Additionally, a few of the officers were aware that the house where the arrest warrant would be executed was involved in a drive-by shooting two days earlier. There was also testimony from the officers of a person peeking out a curtain and ducking back, and sounds of movement in the multi-room, split-level home while persons were removing themselves from the premises at the officers' direction. See *United States v. Tapia*, 610 F.3d 505, 511 (7th Cir. 2010) (noting that gang members sometimes gathered and conducted illegal activities at the house, defendant and his associates had been involved in previous violent crimes, a large car capable of holding up to six people was parked outside of the house, and defendant appearing from the area that was searched were sufficient articulable facts sufficient to warrant a

21

protective sweep of the house). Accordingly, we vacate the trial court's holding that the protective sweep was unlawful.

¶ 53    As an alternative basis, the State also argues that a sweep was justified under the emergency exception based on the children's presence around the drugs. We decline the State's invitation to address this alternative basis as we previously found the protective sweep was lawful. Any additional opinion on this issue would simply be gratuitous and advisory opinions should be avoided. See *People v. Hampton*, 225 Ill. 2d 238, 245 (2007)

¶ 54    The State next argues that the evidence was admissible because it was in plain view and the homeowner consented. There are two exceptions to the warrant requirement: consent and the plain-view doctrine. *People v. Sinegal*, 409 Ill. App. 3d 1130, 1134 (2011). "Evidence seized subject to plain-view observation, pursuant to such a [protective] sweep, would not be violative of constitutional protections." *People v. Pierini*, 278 Ill. App. 3d 974, 980 (1996). Under the plain-view doctrine, an officer may legally seize an item without a warrant where (1) the officer did not violate the fourth amendment by his presence near the plainly viewed item, (2) the incriminating nature of the object is "immediately apparent," and (3) "the officer has a lawful right of access to the object itself." (Internal quotation marks omitted.) *People v. Pearson*, 2021 IL App (2d) 190833, ¶ 48; see also *Horton v. California*, 496 U.S. 128, 136-37 (1990).

¶ 55    As noted above, we agree the officers were lawfully performing a protective sweep. However, we cannot hold that all evidence obtained from the residence was improperly suppressed. First, "[a] 'protective sweep' is a quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police or others," and "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at

22

327. This allowance is made to ensure persons do not launch an unexpected attack on the officers. *Id.* at 333.

¶ 56    Here, officers moved well beyond a visual search of the premises. The protective sweep moved to an actual search of the residence that included the physical lifting of a mattress in defendant's bedroom. Actions that exceed the limited scope of a protective sweep include opening bags. See *Pierini*, 278 Ill. App. 3d at 980. The objects moved were not those "from which a person could launch an unexpected attack." *Id.* While Officer Baudino testified that an emaciated person could hide between mattresses as an excuse for lifting the mattress, such testimony was not found credible by the trial court, and we cannot disagree. Officer Baudino did not have a search warrant and, therefore, his lawful right of access was limited solely to plain view items, not those found between mattresses. Notably, the officer's observation of the items in plain view may have been a sufficient basis for probable cause needed to obtain a search warrant. See *Texas v. Brown*, 460 U.S. 730, 738, n.4 (1983). However, no search warrant was ever requested either prior to the execution of the arrest warrant or after seeing items in plain view during the protective search.

¶ 57    Here, the officers were legitimately on the property. Thereafter, they observed "evidence lying about in the open." *People v. Dennison*, 61 Ill. App. 3d 473, 477 (1978). A search does not occur when officers observe what is in open view. *People v. Berg*, 67 Ill. 2d 65, 68 (1977). While we agree with the State's plain view argument, we do so only for the drugs found on the bedside table, the cooking utensils containing a white powdery substance found on the dresser, and the 28 rounds of 5.56-caliber ammunition, 3 rounds of 7.62-caliber ammunition, and 1 round of .38-caliber ammunition found on top of the armrest of the couch. Therefore, we reverse the trial court's blanket suppression of all the evidence garnered at the scene and hold that the plain view evidence

listed above should not have been suppressed. However, we affirm the trial court's suppression of the drugs and weapons found under the mattress.

¶ 58    The State also argues that even if officers exceeded the limited scope of the protective sweep, they obtained written consent from the homeowner allowing for the search. "An individual may consent to a search, thereby eliminating the need for probable cause and a search warrant." *People v. Vasquez*, 388 Ill. App. 3d 532, 551 (2009). However, the "validity of a consent search depends on the voluntariness of the consent." *People v. Anthony*, 198 Ill. 2d 194, 202 (2001) (citing *People v. Bean*, 84 Ill. 2d 64, 69 (1981)). "Consent must be received, not extracted 'by explicit or implicit means, by implied threat or covert force.' " *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). When determining whether the consent to search was coerced, the totality of the circumstances is considered including " 'subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.' " *Id.* (quoting *Schneckloth*, 412 U.S. at 229). The burden lies with the State to prove that the "consent to search was freely and voluntarily given." *People v. Zynda*, 53 Ill. App. 3d 794, 801 (1977). Generally, a court will not disturb the trial court's determination of voluntariness unless it is clearly unreasonable. *People v. Alvarado*, 268 Ill. App. 3d 459, 463 (1994).

¶ 59    Here, the trial court found that Marina's consent was not voluntary. In support, the trial court relied upon evidence revealing that the consent was obtained long after the protective sweep occurred and that Arrika was presented with a consent form she refused to sign because she was not the homeowner. Thereafter, Arrika's phone was confiscated, and she was handcuffed. When Marina arrived at her home, she was directed to the kitchen. On her way, she noticed that stuff was everywhere, and her bedroom door had been broken down. Marina stated that Sgt. Blackburn initiated the conversation about the consent form and that he told her that her home ownership

24

could be held up. Sgt. Blackburn spoke to Marina for 20 minutes and, after giving her the impression that she would lose her home, she signed the consent to search form. However, Sgt. Blackburn denied speaking with Marina about the consent and claimed that Investigator Hackleman obtained the consent, a fact that Investigator Hackleman denied.

¶ 60　　The State does not present any evidence to undermine Marina's testimony. Instead, it argues that the statements to Marina about her house could not be considered a threat, because the statements were true based on the Drug Asset Forfeiture Procedure Act (725 ILCS 150/1 *et seq*. (West 2020)). Regardless of the veracity of the statement, the statement was made to persuade Marina to sign a consent to search form. Such action undermines the voluntary nature of the consent. It is equally notable that Marina's consent was obtained after the search occurred. She did not provide voluntary consent to search before the protective sweep occurred or before a bedroom door was broken or a mattress was lifted. All of these actions occurred before the officers had consent to search and, therefore, reliance on Marina's consent is unwarranted, especially when this record indicates that no further search occurred after the written consent was signed. Under these facts, we cannot find that the trial court's determination on the voluntariness of Marina's consent was unreasonable. Accordingly, we affirm that finding.

¶ 61　　Finally, the State argues that the trial court's suppression of the evidence recovered from the vehicle was erroneous because the gun was in plain view. The State specifically concedes that it is not challenging the trial court's finding that the State did not establish voluntary consent to search the vehicle. Instead, the State argues that search of the vehicle was proper under the plain-view doctrine because the driveway was curtilage of the property where the arrest warrant was served.

¶ 62    As noted above, the plain-view doctrine allows for seizure of evidence without a warrant where (1) the officer did not violate the fourth amendment by his presence near the plainly viewed item, (2) the incriminating nature of the object is immediately apparent, and (3) the officer has a lawful right of access to the object itself. *Pearson*, 2021 IL App (2d) 190833, ¶ 48. While there is no dispute that the officers were on the property to serve a valid arrest warrant, it was equally undisputed that defendant as well as Brian Ratliff were already handcuffed before the officers decided to search the car. There was no testimony that there was a concern that Washington was hiding in defendant's car and, therefore, the protective sweep would not include the vehicle. Further, even if this court was to consider the exigent circumstances of the children, there was no testimony that the officers were concerned about the children getting in, or being held in, the vehicle. In fact, the undisputed evidence revealed that defendant's vehicle remained locked until he provided his alleged consent. "[P]lain view alone is never enough to justify the warrantless seizure of evidence." *Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971). The doctrine merely supplements a prior valid reason for being present and does not constitute a general, intrusive invasion of a person's privacy. *Id.* at 466. Under the facts of this case, there was no basis for the officers—who were serving an arrest warrant and already had that person, as well as defendant in handcuffs on the front porch—to search a vehicle parked in the driveway of the residence. As noted in *Brown*:

> "We recognized in *Payton v. New York*, 445 U.S. 573, 586-87 (1980), the well-settled rule that 'objects such as weapons or contraband found in a public place may be seized by the police without a warrant. The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.' A different situation is presented, however, when the

property in open view is 'situated on private premises to which access is not otherwise available for the seizing officer.' *Id.* at 587 (quoting *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 352 (1977)). As these cases indicate, 'plain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment. 'Plain view' is perhaps better understood, therefore, not as an independent 'exception' to the warrant clause, but simply as an extension of whatever prior justification for an officer's 'access to an object' may be." *Brown*, 460 U.S. at 738-39.

¶ 63    Here, the officers were on the property to serve an arrest warrant for Brian Ratliff. However, by the time they looked through the windows of defendant's vehicle, the officers already had Brian as well as defendant in handcuffs on the front porch, defendant's vehicle was locked, and no basis of exigent circumstance or the necessity of a protective sweep for the vehicle was provided. Accordingly, we hold that the trial court correctly found that the officers' search of defendant's vehicle was simply an unauthorized warrantless search and affirm the trial court's suppression of the 9-millimeter Taurus G2C, the ammunition accompanying that weapon, the four bags of crack cocaine, and the digital scale.

¶ 64                                III. CONCLUSION

¶ 65    For the above-stated reasons, we vacate the trial court's blanket suppression of all evidence garnered during the execution of the arrest warrant, affirm its order as it relates to evidence found between the mattresses and in the vehicle, and reverse its order as to the drugs found on the bedside table, the cooking utensils for the purported crack cocaine on the dresser, and the ammunition found on the armrest of the couch.

¶ 66    Affirmed in part and reversed in part.